UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| D & M INDUSTRIES, INC. d/b/a<br>CAPITAL FINISHING,<br><br>          Plaintiff,<br><br>          v.<br><br>SCOTT COPUS and AT A GLANCE, LLC,<br><br>          Defendants. | Case No. 21-cv-754 |

## VERIFIED COMPLAINT

Plaintiff D & M Industries, Inc. d/b/a Capital Finishing ("D & M") through its attorneys, Carlson Dash, LLC, and for its Verified Complaint against Scott Copus ("Copus") and At A Glance, LLC ("At A Glance"), states as follows:

### I.   JURISDICTION AND VENUE

1.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, and 18 U.S.C. § 1964(c), because this action alleges violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

2.   This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims that form part of the same case or controversy and derive from a common nucleus of operative facts.

3.   Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Copus resides in, and At A Glance conducts business in, this judicial district, and because a substantial part of the acts or omissions giving rise to the claims set forth herein occurred in and near this judicial district.

## II.   PARTIES AND RELATED COMPANIES

4.   Plaintiff D & M Industries, Inc. d/b/a Capital Finishing is a corporation incorporated in North Dakota and headquartered at 4205 30th Avenue South, Moorhead, MN 56560.

5.   Capital Finishing LLC is a dissolved limited liability company organized in Wisconsin – with its principal office having been located at 40 Countryside Dr., Belleville, WI 53508 with Copus being one of its prior owners.

6.   On information and belief and at times relevant as set forth below, Copus has conducted personal business under the name of the dissolved company Capital Finishing LLC.

7.   As set forth below, on or about December 28, 2017, D & M Industries entered into an Asset Purchase Agreement with Capital Finishing LLC, a now dissolved Wisconsin limited liability company, through which, among other things, D & M agreed to buy certain assets of Capital Finishing LLC including but not limited to its goodwill and the name "Capital Finishing."

8.   Defendant Copus is an individual residing at 957 Timber Ridge Dr., Oregon, WI 53575.

9.   At A Glance, LLC ("At A Glance") is a limited liability company organized in Wisconsin with its principal offices located at 301 Harbour Town Dr., Apt. 320, Madison, WI 53717.  On information and belief, the members of At A Glance are children of Copus.

10.   Mid-America Protective Coatings, Inc. ("Mid-America") is a corporation incorporated in Illinois and headquartered at 85 W. Industrial Drive, Addison, IL 60101.

### III. FACTUAL BACKGROUND

11.   On or about December 28, 2017, D & M entered into an Asset Purchase Agreement (the "APA") with Capital Finishing LLC, Copus and Christopher M. Gaustad with an

2

effective date of December 28, 2017. A copy of the APA is attached as **Exhibit "1"**.

12. On or about January 1, 2018, D & M and Copus entered into an Employment Agreement (the "Employment Agreement") by which D & M employed Copus as a regional manager for the D & M Wisconsin division. A copy of the Copus Employment Agreement is attached as **Exhibit "2"**.

13. On or about January 1, 2018, Copus, as an employee of D & M and its regional manager in Wisconsin, began managing D & M's relationship with certain D & M vendors, including Mid-America, from which entity D & M regularly purchased paint materials.

14. Prior to January 1, 2018, D & M had not purchased any paint products directly from Mid-America; all Mid-America products used by D & M were purchased through its predecessor Capital Finishing LLC, which was managed by Copus at that time.

15. Initially, D & M paid Copus approximately $150,000.00 per year to work as a regional manager for D & M; however, beginning April 1, 2021, , D & M and Copus agreed to reduce his salary to $120,000.00 per year in exchange for increasing the annual bonus potential.

16. In 2018, while employed as D & M's regional manager responsible for supervising D & M's relationship with Mid-America, Copus simultaneously worked for Mid-America as a sales representative, receiving commissions/kickbacks from Mid-America in varying percentages – on average, about 11% – for sales from Mid-America to D & M.

17. From August 2018 to September 2021, this employment/working relationship between Copus and Mid-America was not disclosed by Copus or Mid-America to D & M and was not otherwise known by D & M.

18. Around the time that Copus began working for Mid-America and while Copus was still employed as a regional manager for D & M, Mid-America increased its prices on paint

materials ordered by D & M from Mid-America by 8%.

19. For the period beginning September 1, 2018 and ending September 15, 2021, the total sales as orchestrated by Copus from Mid-America to D & M were in excess of $2,800,000.00.

20. On information and belief, during the relevant time period, Copus received from Mid-America a percentage of the total sales from Mid-America to D & M believed to be in excess of $260,000.00.

21. In January 2021, Mid-America again increased its prices on D & M's orders of paint materials, this time by 7% and further price increases occurred in June 2021.

22. During the period of August 2018 to January 2021, D & M's price for Mid-America's paint materials increased by 15.6%.

23. During the period of August 2018 to January 2021, industry prices for paint materials only increased a total of 6.5%.

24. During the period of August 2018 to January 2021, Copus knew that D & M customers were seeking a "no-stick" paint product and that D & M could readily purchase a "no-stick" paint product on the open market from other suppliers.

25. Rather than direct his employer D & M to purchase "no-stick" paint product from the open market, Copus decided that D & M would work with Mid-America while Mid-America attempted to research and develop a "no-stick" product.

26. At no time during the period of August 2018 to September 2021 did Mid-America successfully develop a "no-stick" paint product.

27. On information and belief, Copus directed and/or turned over a portion – if not all – of the commissions/kickbacks he received from Mid-America to At A Glance.

28. During the period of August 2018 to January 2021, while receiving the hidden payments from Mid-America, Copus concealed the true nature of his relationship with Mid-America from D & M.

29. For at least 45 months, D & M paid Copus his salary at the same time that Copus received commissions/kickbacks from Mid-America based on its gross sales to D & M, and at the same time Mid-America increased its product prices paid by D & M.

30. D & M paid Copus his salary as a key employee while, unbeknownst to D & M, Copus intentionally directed purchase orders and research and development funds to Mid-America in order to continue to receive his hidden commissions/kickbacks from Mid-America.

31. At no time prior to September 15, 2021 did Copus disclose to D & M that he was performing work for a D & M vendor or that he (or At A Glance) was receiving commissions/kickbacks for his performing work for a D & M vendor and while directing purchases to that vendor.

32. D & M was deprived of the honest services of a key employee, Copus, for at least 45 months.

33. On or about September 9, 2021, D&M received Check #24645 in the amount of $6,274.10 payable to "Capital Finshing [sic] | 40 Countryside Dr | Belleville, WI 53508" from Mid-America's Wintrust Commercial Banking account. Check #24645 was dated September 7, 2021 and carried a description: "Vendor: 03339 CAPITAL FINSHING" [sic]. Check #24645 is attached hereto as **Exhibit "3"**.

34. According to Mid-America's records, the amount payable to "Capital Finshing" on Check #24645 is 13% of the August 2021 sales from Mid-America to D & M. See the attached **Exhibit "4"** indicating $48,262.35 in sales to D & M with handwritten note "13%" and

5

"6274.10".

35. D & M contacted Mid-America on or about September 9, 2021 regarding Check #24645, at which time a Mid-America representative informed D & M that D & M was to disregard the check as it had been cut to the wrong company.

36. At that time, the Mid-America representative stated that the check should have gone to Copus, and D & M should discuss the matter with Copus directly.

37. D & M suspended Copus on September 15, 2021 to conduct its investigation related to the relationship between Copus and Mid-America and the direct payment from D & M to Copus.

38. Through the course of D & M's investigation, Copus admitted to the existence and nature of his hidden working relationship with Mid-America and his receipt of commissions/kickbacks from Mid-America based upon the sales from Mid-America to D & M as directed by Copus.

39. Through the course of D & M's investigation, D & M determined that checks such as Exhibit "3" regularly went to Copus and/or At A Glance.

40. As a result of D & M's investigation, D & M terminated Copus's employment effective September 30, 2021 due to Copus's misconduct related to his working relationship with Mid-America at the time he was employed as the regional manager for D & M, which hidden relationship allowed for Copus's theft of a corporate opportunity.

41. As further described below, D & M's investigation uncovered evidence of fraud deriving from Copus's control of a RICO enterprise. Copus utilized At A Glance and Mid-America to perpetuate hundreds of wrongful acts in a racketeering scheme that, were it not detected inadvertently, would still present an ongoing threat to D & M.

42. Such activity as described in the preceding paragraphs were a violation of the Employment Agreement and constituted "cause" for termination of employment under the Employment Agreement.

43. Such activity as described in the preceding Paragraphs constituted material benefit to Copus from a vendor relationship which he failed to disclose, which was a violation of the APA.

44. Copus's fraudulent concealment of the activity as described in the preceding Paragraphs (in conjunction with the active participation by Mid-America) prevented D & M from discovering violations of Copus's Employment Agreement with D & M stemming from the fraudulent concealment of Copus's employment/working relationship with Mid-America.

45. During the course of Copus's hidden employment/working relationship with Mid-America, Copus and/or At A Glance used hundreds of mail and interstate wire communications to create and manage the fraudulent scheme and RICO enterprise.

46. Defendants' scheme involved perpetuating a communication and payment system that went undetected by D & M management whereby its key employee, Copus, was receiving commissions/kickbacks from sales made by Mid-America to D & M at the direction of Copus.

47. Defendants' use of the mails and wires to perpetrate the fraud involved hundreds of communications, including:

    a. Contacts and related negotiation communications exchanged via the mail, facsimile and/or electronic mail;

    b. Communications, including financial payments sent via mail and/or wire to Copus and/or At A Glance, for illicitly-obtained sales by Copus from Mid-America to D & M;

7

c. Product Invoices sent to Plaintiff by which D & M was excessively and deceptively charged for Copus's commissions/kickbacks; and

d. Receiving the proceeds of the Defendants' improper scheme.

## IV. CAUSES OF ACTION

### COUNT I
### Violation of 18 U.S.C. § 1962(c)
### (The Copus – Mid-America Enterprise)

48. Plaintiff repeats, realleges and incorporates by reference its allegations in all prior paragraphs as though fully set forth herein.

49. Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

50. The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of Defendants, including their members, employees and/or agents (the "Copus – Mid-America Enterprise").

51. The Copus – Mid-America Enterprise was created and used as a tool to effectuate Defendants' pattern of racketeering activity.

52. The Defendant "persons" are distinct from the Copus – Mid-America Enterprise.

53. The Copus – Mid-America Enterprise functions as a continuing unit through a hierarchal structure whereby Copus and/or At A Glance as "sales representative" defrauded Mid-America client D & M.

54. The Copus – Mid-America Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of defrauding companies, like D & M, through illicit commissions/kickbacks, overcharging

Plaintiff and earning profits therefrom.

55. Defendants have conducted and participated in the affairs of the Copus – Mid-America Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail and/or wire fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

56. The Copus – Mid-America Enterprise engaged in and affected interstate commerce because Mid-America contracted across state lines with D & M.

57. Defendants exerted control over the Copus – Mid-America Enterprise and Defendants participated in the operation or management of the affairs of the Copus – Mid-America Enterprise through a variety of actions, including the following:

- Defendants created a scheme by which D & M would be defrauded to the benefit of the Copus – Mid-America Enterprise, and by which D & M would be deprived of the honest services of Copus as its regional manager.

- Defendants controlled communications and payments disseminated by the Copus – Mid-America Enterprise ensuring that its commissions/kickbacks derived from D & M sales went undetected.

- Defendants perpetuated a scheme by which D & M received product invoices from Mid-America through which Mid-America excessively and deceptively charged Plaintiff for commissions/kickbacks to a D & M key employee.

58. As detailed above, Defendants' fraudulent scheme consisted of, inter alia: (a) deliberately misrepresenting the cost of Mid-America's paint products to D & M; (b) depriving D & M of honest services of a key employee while simultaneously requiring it to pay inflated

9

prices to fund the secret commissions/kickbacks to the same employee; and (c) fraudulently adjusting the price of Mid-America's products to cover up the amount of commissions/kickbacks received by Copus and/or At A Glance.

59. Defendants' scheme and the above-described racketeering activities amounted to a common course of conduct intended to cause Plaintiff to pay for excessive overcharges on its product invoices and to increase the sales from Mid-America to D & M.

60. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting a similar victim.

61. Until detection of the Copus – Mid-America Enterprise's fraudulent activities, these activities were a part of Copus and Mid-America's ongoing business and constituted a continuing threat to D & M's property and business interests.

62. The pattern of racketeering activity alleged herein and the Copus – Mid-America Enterprise are separate and distinct from each other.

63. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Copus – Mid-America Enterprise.

64. On information and belief, Mid-America knew that Copus was employed by D & M and deliberately hid the commission structure from Copus's employer, as evidenced by **Exhibits 3** and **4**.

65. Defendants' fraudulent scheme was meant to increase their revenues and profits at the expense of D & M and its business interests.

66. D & M has been injured in its property and business interests by reason of these violations in that D & M has made thousands of dollars in payments for paint products that they

would not have made had Defendants not engaged in their pattern of racketeering activity; furthermore, D & M made thousands of dollars in payment for services of a regional manager that it would not have made had Defendants not engaged in their pattern of racketeering activity.

67. D & M's injuries were directly and proximately caused by Defendants' racketeering activity, as described above.

68. By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff for three times the damages D & M has sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT II
## Violation of Common Law of Unjust Enrichment

69. Plaintiff repeats, realleges and incorporates by reference its allegations in all prior paragraphs as though fully set forth herein.

70. To the detriment of D & M, Defendants have been unjustly enriched as a result of the unlawful and/or wrongful collection of, inter alia, payments for excessive invoices received as the result of a fraudulent and deceptive kickback scheme.

71. Defendants have unjustly benefited through the unlawful and/or wrongful collection of, inter alia, payments for excessive invoices received as the result of a fraudulent and deceptive kickback scheme and benefitted to the detriment and at the expense of D & M.

72. Accordingly, D & M seeks full restitution of Defendants' enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

## COUNT III
## Breach of Fiduciary Duty of Loyalty
## Against Copus

73. Plaintiff repeats, realleges and incorporates by reference its allegations in all prior paragraphs as though fully set forth herein.

74. During the period from January 1, 2018 to September 17, 2021, Copus was acting as a fiduciary of D & M in his position of regional manager for D & M's Wisconsin division.

75. As a fiduciary of D & M, and in the role of regional manager, Copus owed D & M a duty of loyalty.

76. As alleged inter alia, Copus used his fiduciary status and the authority of his job as regional manager at D & M to obtain a percentage of sales made by Mid-America to D & M, and to increase the amount of sales to the benefit of Copus and to the detriment of D & M.

77. As alleged inter alia, D & M was damaged as Copus purchased product from Mid-America at a higher price than the market dictated owing to a secret agreement made by and between Mid-America and Copus.

78. As alleged inter alia, D & M was damaged by the loss of potential sales when Copus directed D & M to not purchase products from other vendors but to work with Mid-America on the research and development of a "no stick" paint despite potential buyers explicitly requesting "no-stick" paint from D & M.

79. D & M was further damaged as its payment to Mid-America for product at higher than market prices constituted a commission to its employee that was not negotiated, and a corporate opportunity stolen from D & M by Copus.

80. D & M was further damaged as it was deprived of honest services of Copus, whereby Copus appropriated material business opportunities of D & M as alleged inter alia.

## COUNT IV
**Violation of Wisconsin Organized Crime Control Act, Wis. Stat. § 946.80** *et seq.*

81. Plaintiff repeats, realleges and incorporates by reference its allegations in all prior paragraphs as though fully set forth herein.

82. As detailed above, Defendants formed an enterprise (the Copus – Mid-America

Enterprise) and conducted a pattern of racketeering activity consisting of, inter alia: (a) deliberately misrepresenting the cost of Mid-America's paint products to D & M; (b) depriving D & M of honest services of a key employee while simultaneously providing secret commissions/kickbacks to the same employee; and (c) fraudulently adjusting the price of Mid-America's products to cover up the amount of commissions/kickbacks received by Copus.

83. Defendants have conducted and participated in the affairs of the Copus – Mid-America Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

84. Defendants have maintained interest or control of, inter alia, the proceeds of racketeering activity of the Copus – Mid-America enterprise in violation of Wis. Stat. § 946.83.

## COUNT V
## Breach of Contract
## Against Copus

85. Plaintiff repeats, realleges and incorporates by reference its allegations in all prior paragraphs as though fully set forth herein.

86. As set forth above, Copus fraudulently concealed the nature of his relationship with Mid-America during the time that his employment with D & M was controlled by the Employment Agreement.

87. As set forth above, the actions perpetuated and actively concealed during Copus's relationship with Mid-America constituted breaches of the Employment Agreement (**Exhibit 2**) and the APA (**Exhibit 1**).

88. Specifically, the APA provided, in relevant part, that:

> 2.2  Payment of Purchase Price. … Buyer shall remit to Seller the Sum of $600,000 by additional $100,000 payments on June 1 and

        December 31 of calendar years 2018, 2019 and 2020. In the event Scott Copus is not employed by the Company on an applicable payment date as a result of termination for Cause (as that term is defined in the Employment Agreement between Buyer and Scott Copus referred to in Section 7.2(14) of this Agreement) or as a result of Scott Copus voluntarily terminating his employment with Buyer, Seller shall not be entitled to the then remaining $100,000 payments.

89. The Employment Agreement provided, in relevant part, that:

    9. Termination. Notwithstanding any other provisions of this Agreement, the Agreement shall terminate upon:

    . . .

        b. <u>The existence of "Cause"</u>. For purposes of this Agreement, the term "Cause" shall be defined as:

            1) <u>Employee's material breach of this Agreement or policy or procedure of Employer</u>;
            2) <u>Employee's engaging in any act that constitutes a material conflict of interest with the Employer</u>, including any dishonesty by Employee in dealings with Employer, or the commission of fraud by Employee;

            . . .

            6) Employee performing any act or omitting to perform any act for which Employer believes a prudent company, acting in good faith, would terminate the employment of an employee;

            . . .

            9) <u>The appropriation of a material business opportunity of the Employer (including attempting to secure or securing any personal profit in connection with any transaction entered into on behalf of the Employer)</u>;

90. Had D & M known as early as August 2018 that Copus had violated and was in breach of his Employment Agreement in the manner set forth above, D & M would have terminated his employment as early as August 2018 for cause.

91. But for the fraudulent concealment of Copus's activities which were clear violations of the Employment Agreement, D & M would have terminated the Employment Agreement for cause and would not have made any future payments to Copus under Paragraph 2.2 of the APA (totaling $500,000.00). **Exhibit 1** at p. 6.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter an order or judgment against Defendants including the following:

A. Damage to be proven at trial including, but not limited to the amount of out-of-pocket losses for payments for excessive supply invoices as the result of a fraudulent and deceptive kickback scheme and the payments made under the APA after August 2018;

B. Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

C. Pre-judgment and post-judgment interest on such monetary relief;

D. Equitable relief in the form of restitution to restore monies received by Defendants as a result of the unfair, unlawful and/or deceptive conduct alleged in herein;

E. Other appropriate injunctive or declaratory relief;

F. The costs of bringing this suit, including reasonable attorneys' fees; and

G. All other relief to which Plaintiff may be entitled at law or in equity.

Dated this 30th day of November, 2021

CARLSON DASH, LLC

By: /s/ C. Douglas Moran
    C. Douglas Moran (Bar No. 1091893)
    Jonathan S. Safron (ARDC No. 6330377)
    10411 Corporate Dr., Suite 100
    Pleasant Prairie, WI 53158
    Telephone: (262) 857-1600
    Email: cdmoran@carlsondash.com
    Email: jsafron@carlsondash.com

## VERIFICATION

Under penalties of perjury, the undersigned as President of D & M INDUSTRIES, INC. certifies that the statements set forth in the foregoing Complaint are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certified as aforesaid that he verily believes the same to be true.

*[signature]*

Brian Becker