# **EXHIBIT 1**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("Agreement") is entered into effective as of December 28, 2017, (the "Effective Date") by and between **CAPITAL FINISHING LLC** ("Seller"), a limited liability company organized and existing under the laws of the State of Wisconsin whose address is 40 Countryside Drive, Belleville, Wisconsin 53508; **SCOTT COPUS**, whose address is 957 Timber Ridge Drive, Oregon, Wisconsin 53575; **CHRISTOPHER M. GAUSTAD**, whose address is 222 Champion Drive, Evansville, Wisconsin 53536; and **D & M INDUSTRIES, INC.,** and its successors and assigns ("Buyer"), a North Dakota corporation whose address is 4205 – 30th Avenue South, Moorhead, Minnesota 56560. (Buyer, Seller, Scott Copus and Christopher M. Gaustad are sometimes hereinafter collectively referred to as the "Parties" and individually as a "Party".)

## Recitals

A.      Buyer is engaged in the business of the sale and distribution of doors, frames, hardware, millwork, cabinets and windows.

B.      Seller is engaged in the business of door, trim and millwork painting and staining.

C.      Seller desires to sell to Buyer, and Buyer is willing to purchase from Seller, on the terms and subject to the terms and conditions of this Agreement, certain assets of Seller associated with Seller's business operation ("Business") located in Wausau and Belleville, Wisconsin (collectively the "Business Real Estate").

D.      Scott Copus and Christopher M. Gaustad (individually and collectively the "Members") own all of the issued and outstanding membership interests of Seller, whether voting, non-voting, common or preferred and desire to facilitate this transaction.

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties contained in this Agreement, the Parties agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF ASSETS

1.1      Purchased Assets.  Subject to the terms and conditions of this Agreement, at Closing, (as defined in Section 7.1), Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase and acquire from Seller, all of Seller's right title and interest in and to the following described assets of Seller whether tangible, intangible, or personal and wherever located free and clear of any mortgages, encumbrances, charges, claims, conditions, liens, options, pledges, security interests, rights of first refusal, equities, covenants, conditions or restrictions or adverse claims of any nature (collectively the "Encumbrances"):

(01)    Fixed Assets.  All of Seller's fixed assets generally described as all machinery, vehicles, equipment, shop tools, special equipment, computer hardware, furniture,

1

shelving and fixtures as the same shall exist as of the Closing owned by Seller and used or useful in connection with its Business including, but not limited to, those fixed assets described on attached Schedule 1.1(01) ("Fixed Assets").

(02)   Inventory.  All inventory held for sale by Seller in the ordinary course of its Business as well as all paint and packaging materials as the same shall exist as of the Closing ("Inventory"). As a part of the Closing, the Parties shall prepare and attach to the Bill of Sale (as that term is defined in Section 7.2(01)) a description of the Inventory.

(03)   Trade Accounts Receivable.  Other than the Charged-Off Accounts, as defined in Section 2.4 (01), all trade accounts receivable of Seller generated in the ordinary course of its Business ("Trade Accounts Receivable") as the same shall exist at Closing.  As a part of the Closing, the Parties shall prepare and attach to the Bill of Sale a detailed description of the Trade Accounts Receivable.

(04)   Goodwill, Name, Intangibles and Data.  All goodwill and intangible personal property of Seller (including, without limitation, the names "Capital Finishing" and "Madison Pre-Hung Doors") and any variations thereof in connection with the Business and Seller's operations including all supply and vendor records, price lists, customer lists, purchase and histories, shop reference manuals and parts reference catalogs, other books and records containing customer information relevant to the Business, all computer programs, software, hardware, tapes and other materials used to store, record or produce customer information, all sales data, all telephone numbers, facsimile numbers, domain names, web sites, e-commerce sites and accounts, (including E-Bay, Facebook, Instagram, Twitter and MySpace, etc.) URL's, marketing and distribution information, promotional literature and supplies and materials used by Seller in the operation of the Business and the writings and drawings in which any of the foregoing may be embodied as the same shall exist as of the Closing ("Goodwill").  Attached as Schedule 1.1(04) is a description of the telephone numbers, facsimile numbers, domain names, web sites, e-commerce sites, and accounts of Seller.

(05)   Rights Under the Contracts to be Assumed.  All assignable rights and privileges of Seller under any contracts, leases, vendor service contracts, or prepaid maintenance contracts in connection with the operation of the Business entered into in the ordinary course of business as specifically identified on Schedule 1.1(05) attached hereto (collectively the "Contracts to be Assumed").

(06)   Warranties.  To the extent legally assignable and transferable, all rights of Seller in, to and under any warranties and guaranties pertaining to the Purchased Assets.

All of the above assets, properties and rights of Seller to be sold, assigned and transferred to Buyer at Closing are collectively referred to as the "Purchased Assets".

2

    1.2    <u>Excluded Assets</u>.  With the exception of the Purchased Assets, Buyer does not purchase and Seller does not sell any other assets of Seller including, without limitation the following items (collectively the "Excluded Assets"): (i) all personal effects and property of Seller's employees or owners; (ii) the corporate and accounting records, tax returns, minute books, and corporate seal of Seller; (iii) all personnel records and other records which Seller is required by law to retain in its possession; (iv) all rights and funds in connection with retirement, employee benefit and similar plans; (v) benefits under insurance policies related to unassigned liabilities; (vi) cash and cash equivalents of Seller and all work in process; (vii) those records and documents of Seller that constitute attorney-client privileged information; (viii) all rights, privileges, and claims, including all rights of defense, offset, protest or contest, related to any liability, obligation, claim or expense of Seller arising out of its operation of the Business; (ix) all of Seller's prepaid expenses; (x) the Charged-Off Accounts (as that term is defined in Section 2.4(01); and (xi) those items of personal property described on <u>Schedule 1.2</u> attached hereto.

    1.3    <u>Employee Matters</u>.

    (01)    Seller and Buyer specifically agree that Buyer does not assume any obligations or liabilities now or hereinafter owed by Seller to any of its employees except as specifically stated herein.  Seller shall be fully responsible for any liabilities or obligations relating to or associated with the termination of employment of any of Seller's employees whether or not as a result of the transaction contemplated by this Agreement including the payment of any and all wages (including unused but accrued vacation, sick leave wages and paid time off) due any employee of Seller prior to the Closing Date.  Seller expressly agrees to maintain its health and welfare plans for the benefit of any employees not hired by Buyer, and other eligible qualified beneficiaries, as required by the Consolidated Omnibus Budget Reconciliation Act, as amended ("COBRA") or any other similar applicable federal or state law.

    (02)    On the Closing Date, Buyer may but shall not be obligated to offer employment to any of Seller's then current employees.  Buyer agrees not to contact or solicit any employees of Seller, prior to the Closing, without first coordinating such contact with Seller.  Seller agrees that no later than ten (10) Business Days (as defined below) before Closing, Seller shall provide Buyer with full access to Seller's employees.  Seller shall be liable for any obligations to any employee not hired by Buyer, and any eligible qualified beneficiaries, as required by COBRA or any other applicable law.  The term "Business Day" shall mean every Monday through Friday of the year, except those days on which national banks are closed in Wisconsin.  Seller shall terminate those employees that Buyer intends to hire on the day immediately preceding the Closing Date effective no later than 11:59 p.m.

    (03)    The Parties agree that: (i) this Agreement is not intended to create a contract between Buyer or any of its affiliates or subsidiaries, on the one hand, and any employee of Seller ("Employee"), on the other hand, and no  Employee may rely on this Agreement as the basis for any breach of contract claim against Buyer or

any of its affiliates or subsidiaries; (ii) nothing in this Agreement shall be deemed to require Buyer or any of its affiliates or subsidiaries to continue to employ any particular Employee for any period after the Closing, as they shall be "at will" employees; (iii) nothing in this Agreement shall be deemed to create a right in any Employee to employment with Buyer or any subsidiary or affiliate of Buyer; (iv) nothing in this Agreement shall be deemed to limit the right of Buyer or any of its affiliates or subsidiaries to terminate the employment of any Employee hired by Buyer after Closing; and (v) nothing in this Agreement shall modify or amend any employee benefit plan of Buyer or any of Buyer's subsidiaries or affiliates or other agreement, plan program, or document.

1.4     No Liabilities Assumed. With the exception of the liabilities expressly identified on Schedule 1.4 (collectively the "Assumed Liabilities"), Buyer does not assume or agree to pay any debts, liabilities, or other obligations (whether accrued, absolute or contingent, known or unknown, or now existing or hereinafter incurred, regardless of when asserted) of Seller. Accordingly, nothing contained in this Agreement or the acceptance of the Purchased Assets by Buyer shall be deemed to result in the assumption of any debts, liabilities, or other obligations of Seller.  Without limiting the foregoing, Seller shall remain solely obligated for each of the following liabilities (none of which will constitute Assumed Liabilities): (i) legal, accounting, and other expenses incurred by Seller in connection with this Agreement or the consummation of the transactions contemplated thereby; (ii) any of Seller's liabilities or obligations under this Agreement or under any other agreement between Seller on the one hand and Buyer on the other hand; (iii) debts, liabilities, or obligations of any nature to any past or present owner, member, officer or manager of Seller; (iv) federal, state, or local income, franchise, use, property (personal or real), sales, payroll, or other taxes imposed on Seller; (v) debts, liabilities, or obligations of Seller, direct or indirect, fixed, contingent, liquidated, unliquidated or otherwise, arising out of any contract or agreement, tort, or other claim whether arising under local, state or federal law, whether or not then known, due or payable; (vi) any liabilities or obligations resulting from violations of any environmental laws; (vii) any liabilities or obligations which relate to any employee or employee plan, including any liability or obligation under COBRA to any employee (and any other eligible beneficiary) who does not accept Buyer's offer of employment and any liabilities arising from those contracts, agreements or plans identified on Schedule 3.1(09)(a) and (d); (viii) any liabilities or obligations against which Seller is insured or otherwise contractually indemnified by a person other than Buyer; (ix) all warranty claims based upon the sale of goods or services which occurred or existed before the Closing whether or not then known; and (ix) any broker or finder's fees attributable to Seller or Members arising as a result of this transaction.

1.5     Assignment and Assumption of Certain Contracts. At Closing, Seller shall assign to Buyer all of Seller's right, title, interest, obligations and benefits under the Contracts to be Assumed. At Closing, Buyer shall assume, pursuant to a General Assignment and Assumption Agreement in the form of Exhibit "B" attached hereto, the liabilities or obligations set forth in the Contracts to be Assumed that arise from and after the Closing Date. Seller agrees to use commercially reasonable efforts, along with Buyer's reasonable cooperation, to obtain consents to such assignments; however, if such consent shall not be obtained on or before the Closing Date, Seller agrees, if requested by Buyer, to cooperate with Buyer after the Closing in

implementing any reasonable arrangement designed to provide for Buyer the benefits under any such Contract to be Assumed, and Buyer shall reimburse Seller for expenses relating to the enjoyment of such benefits, upon written demand by Seller, and shall assume such obligations upon receipt of consent from the other party under the Contracts to be Assumed. Buyer shall not be obligated to assume any Contract to be Assumed for which consent by all necessary third parties has not been obtained as of Closing.  Seller and Buyer shall execute such forms of assignment and assumption and provide such other reasonable cooperation as may be necessary to effect the assignments.  Seller warrants now and as of the time of Closing, that the Contracts to be Assumed are in full force and effect and are binding upon and enforceable against the parties thereto and that there are no defaults or other events which with the giving of notice, passage of time, or both would constitute defaults of Seller or any other parties thereto.  Seller represents that no consent from any third party is required in connection with the transfer and assignment of the Contracts to be Assumed.

      1.6     <u>Physical Inventories</u>.  A physical inventory of the Purchased Assets shall be conducted by representatives of Seller and representatives of Buyer. The physical inventory count shall be taken as close as practicable to the Closing Date, but no later than two (2) Business Days before the Closing Date, and will be adjusted to reflect purchases and sales from the date of such physical inventory count to the Closing Date. Seller agrees that no such additions and deductions shall be made in such inventory except in the ordinary course consistent with past practices and, further, to keep its usual and adequate records of such additions and deductions, which records shall be made available to Buyer at Closing for review and verification.

ARTICLE 2
PURCHASE PRICE AND PAYMENT

      2.1     <u>Purchase Price</u>.  The purchase price for the Purchased Assets ("Purchase Price") shall be the total of the amounts of the following components:

     (01)    <u>Fixed Assets</u>. The purchase price for the Fixed Assets shall be the agreed upon amount of Seven Hundred Forty Thousand Dollars ($740,000.00), minus the value of any Fixed Assets sold, damaged, destroyed or discarded by Seller after the date of this Agreement as such value is reflected on <u>Schedule 1.1(01)</u>; plus

     (02)    <u>Inventory</u>. The purchase price for the Inventory shall equal the sum of the invoice price of each item of Inventory; plus

     (03)    <u>Trade Accounts Receivable</u>.  Other than the Charged-Off Accounts (as defined in Section 2.4(01)), the purchase price for the Trade Accounts Receivable shall be equal to the actual amount of such Trade Accounts Receivable as set forth on Seller's financial statement as of the date of Closing; plus

     (04)    <u>Goodwill</u>.  The purchase price for the Goodwill shall be Four Million Thirty-Five Thousand Dollars ($4,035,000.00).

5

2.2     Payment of Purchase Price.  At the Closing, Buyer will deliver to Seller the Purchase Price by wire transfer in immediately available funds.  In addition, Buyer shall remit to Seller the sum of $600,000 by additional $100,000 payments on June 1 and December 31of calendar years 2018, 2019 and 2020.  In the event Scott Copus is not employed by the Company on an applicable payment date as a result of termination for Cause (as that term is defined in the Employment Agreement between Buyer and Scott Copus referred to in Section 7.2(14) of this Agreement) or as a result of Scott Copus voluntarily terminating his employment with Buyer, Seller shall not be entitled to the then remaining $100,000 payments.  Any additional payments made by Buyer to Seller pursuant to this Section shall be allocated to Goodwill.  With respect to the Inventory and Trade Accounts Receivable provisions of Section 2.1(02) and (03) respectively, it is anticipated that the total amount of said two (2) categories is approximately $625,000.

2.3     Allocation of Purchase Price.  The Purchase Price shall be allocated among the Purchased Assets as specified in Section 2.1. and 2.2 Buyer and Seller agree to report this transaction for state and federal tax purposes in accordance with such allocation including, without limitation, the reports required to be filed under Section 1060 of the Internal Revenue Code, if applicable.  In any proceeding related to the determination of any tax, neither Buyer nor Seller shall contend or represent that such allocation is not a correct allocation.

2.4     Post-Closing Purchase Price Adjustment.

(01)     A Trade Account Receivable, or any portion thereof, will be deemed uncollectible (the "Uncollectible Accounts") if it remains unpaid as of the close of business one hundred twenty (120) days after the Closing Date (the "Termination Date"). Buyer shall use commercially reasonable efforts to collect all of the Trade Accounts Receivable; provided, however, that Buyer shall not be required to bring any legal action to collect any such accounts. If more than one invoice is outstanding for a customer, the "first-in, first-out" principle shall be applied in determining the invoice to which a payment relates, unless the payment by its terms (and without any undue influence on the part of Buyer) specifies or clearly indicates the invoice to which it relates. At least ten (10) days before the Termination Date, Buyer shall provide Seller with a schedule of the Uncollectible Accounts (the "Uncollectible Accounts Schedule") together with supporting documentation. Seller shall have ten (10) Business Days following receipt of the Uncollectible Accounts Schedule together with any supporting documentation reasonably requested by Seller in which to accept the Uncollectible Accounts Schedule or to challenge it by delivering a written notice of dispute to Buyer, which dispute shall be resolved subject to the dispute resolution procedures set forth in Section 2.4 (02). If no such notice is delivered within ten (10) Business Day period, Buyer's Uncollectible Accounts Schedule shall be conclusive.  Upon final resolution of the disputed Uncollectible Accounts, the Uncollectible Accounts shall revert to and become the property of Seller and the Parties will execute such documents as may be advisable to be executed based on the advice of counsel of either Party. Notwithstanding the foregoing, Seller has charged-off certain accounts as described on Schedule 2.4 (01) attached hereto (the "Charged-

Off Accounts"). The Charged-Off Accounts are not being purchased by Buyer, shall remain the property of Seller, and shall not be included in calculating the Purchase Price. As such, Buyer agrees to surrender to Seller any proceeds that Buyer may receive from the Charged-Off Accounts. Seller shall have the sole responsibility to collect the Charged-Off Accounts.

(02)    If the Parties are unable to resolve their dispute regarding Buyer's Uncollectible Accounts Schedule, all amounts remaining in dispute shall be submitted to Eide Bailly LLLP (the "Arbitrator"). The Parties shall cooperate with, and provide all necessary information to the Arbitrator in order to expedite the Arbitrator's analysis of the disputed Uncollectible Accounts and the Arbitrator's decision shall be final, binding, and conclusive on the Parties. All fees and expenses relating to the work, if any, to be performed by the Arbitrator shall be paid by the Party whose position concerning the Uncollectible Accounts was not supported by the Arbitrator. If the Arbitrator does not support either of the Parties' position, then all fees and expenses relating to the work performed by the Arbitrator shall be borne equally by the Seller on the one hand, and Buyer, on the other hand.

(03)    In the event that the Parties agree to a resolution, or the Arbitrator determines, that Buyer is correct with regard to the dispute, Seller shall promptly (and in any event within three (3) Business Days) deliver to Buyer by wire transfer or other immediately available funds, the sum of the amount of the Uncollectible Accounts and the Purchase Price shall be deemed adjusted accordingly.

(04)    The provisions of this Section 2.4 are not the exclusive remedies of any Party.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

3.1    <u>Representations and Warranties</u>.  Seller and Members represent and warrant to Buyer as of the date of this Agreement and as of Closing as follows:

(01)    <u>Organization of Seller</u>.  Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Wisconsin and has all necessary and appropriate corporate powers and authority to own its properties as now owned by it and to carry on its business as now being conducted in the State of Wisconsin and in any other state in which it conducts its business.

(02)    <u>Subsidiaries and Affiliates</u>.  Seller has no subsidiaries and does not own, directly or indirectly, any interest or investment (whether equity or debt) in any corporation, limited liability company, partnership, business, trust or other entity. No portion of the Business operations have been conducted through any affiliate of Seller.

(03)    <u>Financial Statements</u>.  Seller has delivered or will cause to be delivered to Buyer copies of the following financial statements: (i) the compiled prepared financial statements of Seller as of December 31, 2014, December 31, 2015 and

7

December 31, 2016; and (ii) a self-prepared financial statement for Seller as of October 31, 2017, attached as Schedule 3.1(03) (collectively with all other financial statements delivered to Buyer, the "Financial Statements"). The Financial Statements fairly present the financial position of Seller as of the respective dates thereof and the results of Seller's operations for the respective periods indicated and are complete and accurate in all material respects. Since August 30, 2017, there has not been any: (a) event or condition of any character materially and adversely affecting the financial condition, business, assets, or prospects of Seller; (b) amendment, termination or cancellation of any contract, agreement, or license to which Seller is a party which materially and adversely affects the condition of Seller, (whether financial or otherwise) the Purchased Assets, the Business Real Estate or the Business; (c) other event or condition of any character that might reasonably have a material and adverse effect on the financial condition, business, assets, or prospects of Seller, the Purchased Assets, the Business Real Estate or the Business; or (d) agreement, contract, or commitment by Seller to do any of the things described in the preceding clauses (a) through (c).

(04)     Absence of Undisclosed Liabilities.   Seller has no material debt, liability or obligation of any nature, whether accrued, absolute, contingent, or otherwise and whether due or to become due, that is not reflected or reserved against in full in the Financial Statements, except for those that may have been incurred after August 30, 2017. All debts, liabilities, and obligations incurred after August 30, 2017, were incurred in the ordinary course of business, and are usual and normal in amount, both individually and in the aggregate.

(05)     Taxes. Within the times and in the manner prescribed by law, Seller has filed all federal, state, local, and foreign tax returns required by law, or appropriate and permitted extensions thereto, and has accrued and paid all taxes, assessments, and penalties due and payable by Seller. There are no present disputes as to taxes of any nature payable by Seller or payable with respect to sales, use, income, earnings, or property. Seller has no state, county, or local sales, use, employment, unemployment or property tax liability which is past due.

(06)     Names and Rights. With the exception of "Capital Finishing", Seller uses no other trademark, service mark or trade name in the Business, and does not own and has no right to use any other trademarks, trade names by registration, license or otherwise relating to the operation of the Business. No other person or entity owns any trademark, trade name, trademark or trade name registration, the use of which is necessary or contemplated in connection with the operation of Seller's business or in connection with the performance of any contract to which Seller is a party. Seller has not infringed, and is not now infringing, on any trade name or trademark, belonging to any other person or entity. Seller has not taken any steps to formally protect Seller's use of the name "Capital Finishing", other than the protections, if any, resulting from the formation and maintenance of the entity "Capital Finishing LLC" under Wisconsin law.

8

(07) <u>Title to Assets</u>.  Seller is the owner, legally and beneficially, of the Purchased Assets and has good and marketable title to the Purchased Assets.  As of the Closing, all of the Purchased Assets will be free and clear of restrictions on or conditions to transfer or assignment, and free and clear of any Encumbrances.  The Purchased Assets to be transferred hereunder include all of the assets and personal property utilized by Seller in any material respect in the conduct of the Business as of the Effective Date as presently conducted, except as listed on Schedule 1.2.  All of the material tangible personal property of Seller to be conveyed to Buyer is, in all material respects, in good working order and mechanical condition, normal wear and tear excepted, and is immediately operable in all material respects.

(08) <u>Location</u>.  At Closing, the Purchased Assets will be located at the Business or in such other location mutually agreed upon by Buyer and Seller.

(09) <u>Employment Matters</u>.

   (a)   Except as set forth on <u>Schedule 3.1(09)(a)</u> or <u>3.1(09)(d)</u>, Seller is not a party to any employment contract or collective bargaining agreements, or any pension, bonus, profit sharing, stock option, retirement or other similar agreements, arrangements or plans.  Buyer shall assume no obligation or liability whatsoever for any benefits due employees of Seller should any such plans or contracts exist, except to the extent such obligation or liability is an Assumed Liability.

   (b)   Attached hereto as <u>Schedule 3.1(09)(b)</u> is a list which correctly identifies all employees currently employed in the conduct of the Business and describes the rate and nature of all compensation (including, without limitation, wages, salaries, bonuses and all other benefits and compensation plans) payable by Seller to such employees.  There are no pending or, to the knowledge of Seller and Members, threatened labor dispute, strike, work stoppage or organization campaign affecting the employees.  None of the employees are represented by a labor union or organization.  Seller is in compliance in all material respects with all federal and state laws respecting employment and employment practices, terms and conditions of employment, and wages and hours, and is not engaged in any unfair labor practices.

   (c)   Buyer shall not assume or succeed to any labor or employment contracts applicable to Seller and shall not pay, assume or have any obligation of any kind with respect thereto, or with respect to any employees of Seller or with respect to any liabilities arising out of or in connection with any employee benefit plan of any kind, including any employee benefit plan or arrangement of Seller whether arising before, on or after the Closing Date (each an "Employee Plan"), and any liabilities in connection with any Employee Plan (including any "employee benefit plan" as defined in

9

Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) as a result of Seller being considered a "single employer" within the meaning of Sections 414(b), (c), (m), (n) and (o) of the Code, except to the extent such contract, obligation or liability is an Assumed Liability.

(d)     Attached hereto as Schedule 3.1(09)(d) is a description of each Employee Plan. Seller has furnished to Buyer a copy (or a written description with respect to any unwritten plan) of each Employee Plan and the related plan documents (including trust documents, insurance policies or contracts, employee booklets, summary plan descriptions and other authorizing documents, and any material employee communications relating thereto). All contributions required to be made by Seller to any Employee Plan have been made on or before their due dates and a reasonable amount has been accrued for contributions to each Employee Plan for the current plan years and all required payments from each Employee Plan have been made. Each Employee Plan can be amended, terminated or otherwise discontinued by Seller after the Closing in accordance with its terms, without liability to Buyer. All premiums required by any Employee Plan have been paid thereunder or accrued on the books of Seller. All outstanding obligations or payments for services performed or accrued vacation, personal days, paid time off leave days, holiday pay, earned commissions, compensatory time, accrued bonuses or other benefits (monetary or non-monetary) owed to any present or former employee, officer, consultant or director of Seller have been paid when due or accrued on the books of Seller and, to the extent required by generally accepted accounting principles consistently applied, are reflected in Seller's Financial Statements. No action or failure to act with respect to any Employee Plan could subject Buyer (or any of its affiliates) or any Employee Plan to any tax, penalty or other material liability, for breach of fiduciary duty or otherwise, under ERISA or any other applicable law, whether by way of indemnity or otherwise.

(e)     For every Employee Plan of Seller: (i) the Employee Plan has been established, administered and maintained in accordance with its terms and in accordance with applicable laws including, without limitation, ERISA, the Code and the Patient Protection and Affordable Care Act; (ii) each individual who is classified by the Company as an independent contractor has been properly classified for purposes of participation and benefit accrual under each Employee Plan; (iii) all required reports and descriptions (including Form 5500 annual reports, summary annual reports, and summary plan descriptions) have been timely filed and/or distributed in accordance with the applicable requirements of ERISA and the Code with respect to each such Employee Plan; and (iv) the consummation of the transactions contemplated by this Agreement will not accelerate the time of payment or vesting of, or increase the amount

of, or result in the forfeiture of compensation or benefits under, any Employee Plan, or result in any "parachute payment," within the meaning of Section 280G of the Code.

(f)     None of the Seller's Employee Plans relating to its employees is (i) a multiemployer plan, as defined in Section 3(37) of ERISA, or (ii) subject to Title IV of ERISA.

(g)     No Employee Plan provides life, health or other welfare benefits to former or retired employees of Seller, and Seller has no liability or obligation to provide life, medical or other welfare benefits to former or retired employees or their spouses or other beneficiaries other than pursuant to COBRA or similar state laws which require limited continuation of coverage for such benefits.

(10)     Insurance Policies.   Seller has maintained, now maintains and shall maintain through and including the Closing (a) insurance on all of its assets and business of a type consistent with Seller's insurance in place at the date of execution of this Agreement, and (b) adequate insurance protection against all liabilities, claims, and risks against which it is customary to insure.

(11)     Compliance with Laws.   Seller has complied in all material respects with, and is not in violation in any material respect of, any applicable federal, state or local statutes, laws, and regulations (including, without limitation, any applicable building, zoning, or other law, ordinance, regulation or decree) affecting Seller or the Business Real Estate.

(12)     Litigation.   Except as set forth in the following sentence, there is no claim, suit, action, arbitration, or legal, administrative, or other proceeding, or to Seller's knowledge governmental investigation pending or, to Seller's knowledge, threatened against Seller, Members or the business of Seller, which affects or may affect any of the Purchased Assets, the Business Real Estate, the Business or the ownership, title, condition, or value of any of the Purchased Assets, the Business Real Estate or the Business.   Seller is currently involved in the following three (3) matters: a) a preference claim asserted by Holley Molding, and b) two separate claims by persons asserting they were wrongfully discharged by Seller.   Seller shall be solely responsible for the resolution of all three (3) claims, at no cost to Buyer.   Neither Seller nor Members are subject to or in default with respect to any order, writ, injunction, judgment, or decree of any federal, state, local or foreign court, department, agency, or instrumentality.

(13)     No Breach or Violation.   The entering into of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in or constitute any of the following: (a) a default or an event that, with notice or lapse of time or both, would be a default, breach, or violation of the articles of organization, operating agreement, member control agreement or any other

11

corporate or organizational documents of Seller, or any lease, license, promissory note, contract, commitment, indenture, mortgage, deed of trust, or other agreement, instrument, or arrangement to which Seller is a party or by which Seller or the property of Seller is bound; (b) an event that would permit any party to terminate any agreement or to accelerate the maturity of any indebtedness or other obligation of Seller; or (c) the creation or imposition of any lien, charge, or encumbrance on any of the properties of Seller or the Purchased Assets, pursuant to any such agreement or indebtedness.

(14)   <u>Authority</u>.   Seller and Members have the right, power, legal capacity, and authority to enter into, and perform the obligations under this Agreement and the related documents to be delivered in connection herewith, and no approvals or consents of any persons or entities are necessary. The execution and delivery of this Agreement by Seller and the consummation of the transactions contemplated in this Agreement have been duly authorized by Seller's members.

(15)   <u>Books and Records</u>.   The books of account of Seller as they relate to the Business are complete and correct in all material respects, and there have been no transactions involving the Business or the Purchased Assets which properly should have been set forth therein and which have not been accurately so set forth in all material respects.   All of the accounts, notes, and loans receivable that have been recorded on the books of the Business are bona fide and represent amounts validly due for goods sold or services rendered by Seller in the ordinary course of business.

(16)   <u>Licenses and Permits</u>.   Attached hereto as <u>Schedule 3.1(16)</u> is a list of all federal, state, and local governmental licenses, certificates and permits (collectively "Permits") held or applied for by Seller which relate to the conduct of the Business and the Business Real Estate. Seller has complied in all material respects with the terms and conditions of all such Permits and no violation of any such Permit governing the issuance or continued validity thereof has occurred.   To Seller's and Members' knowledge, no additional license, certificate or permit is required in connection with the conduct of the Business as it is currently being operated by Seller.

(17)   <u>Interests in Competitors. Suppliers and Customers</u>.   Except for Madison Pre-Hung Doors, Inc., no officer, manager or member of Seller, nor any spouse or child of such person, has any ownership interest in any competitor, supplier or customer of the Business.

(18)   <u>Environmental Matters</u>.   Seller has at all times been in compliance in all material respects with the provisions of all federal, state and local environmental, health and safety laws and ordinances, and all rules and regulations issued thereunder and has not and is not aware of any contamination of any of the property it occupies or has occupied by any "Hazardous Substance", including without limitation the Business Real Estate.   For purposes of this Agreement, Hazardous

12

Substance means any hazardous waste, toxic substances, polychlorinated byphenyls, asbestos or related materials. The term includes, petroleum, crude oil or any fraction thereof, natural gas, natural gas liquids, liquified natural gas as a synthetic gas usable for fuel or mixtures thereof, and includes substances released from underground storage tanks. The term also includes any element, compound, mixture, solution or substance regulated by federal, state or local law, rule or regulation because of its toxicity, corrosiveness, reactivity or igniting ability or carcinogenic effect. To Seller's knowledge, Seller warrants and represents that none of the property Seller occupies has, in the past, been used and is not presently being used for the handling, storage, transportation or disposal of any Hazardous Substance except those normally used in the operation of the Business and then in such instances in compliance in all material respects with the provisions of federal, state and local environmental, health and safety laws and ordinances, and all rules and regulations issued thereunder. Seller and Members specifically hereby agree to defend, indemnify and hold Buyer harmless from and against any and all claims, damages, judgments, penalties, costs and expenses (including attorneys' fees and court costs) now or hereafter arising from the enforcement of this paragraph, arising directly or indirectly from the activities of Seller, its predecessors, or of third parties arising directly or indirectly from any violation by Seller, its predecessors or of third parties of any environmental protection, health or safety law, whether such claims are asserted by any governmental agency or any other person.

(19)   Information Furnished.   No representation or warranty made by Seller or Members in this Agreement, and no exhibit or schedule hereto, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein and therein not misleading.

(20)   Reliance.   Seller and Members have performed their own due diligence examination with respect to all matters contained in or beyond the scope of Buyer's representations and warranties in this Agreement. In addition, without limiting the foregoing, Seller and Members acknowledge that they are relying upon their own analysis concerning the value of the Purchased Assets and all other material facts. No other representations, promises, or agreements have been made to Seller and Members other than as expressly set forth in this Agreement and Buyer shall not be bound by any alleged understandings, agreements, promises, representations, covenants or stipulations which are not set forth fully in this Agreement.

(21)   Broker.   Neither Seller nor Members are under a contract with a broker, agent, consultant or other similar person to pay a fee in exchange for assisting Seller and Members in procuring, negotiating or closing the transactions hereunder.

(22)   Zoning.   The Business Real Estate complies in all material respects with all zoning ordinances, energy and environmental laws, all building and use

restrictions and codes and any requirements with respect to licenses, permits and agreements necessary for the lawful use and operation of Seller as presently operated and will continue to be in compliance with all such ordinances, codes, licenses, permits and agreements on the Closing Date.

(23)  Default.  Seller is not in default of any material provision under any material agreement, instrument, decree or to which it is a party or by which any of its properties, including without limitation, the Purchased Assets and the Business Real Estate, are bound or affected.

(24)  Customers.  Seller and Members have no information, nor are they aware of any facts, indicating that any material customers of Seller intend to cease doing business or materially alter the amount of business that they are presently doing with Seller.

(25)  Warranties.  Seller does not offer any warranties with respect to products sold and services provided to its customers and there are no outstanding claims against Seller in connection with the conduct of its Business for products sold or services rendered by Seller.  Seller agrees that in the event Buyer elects to repair, replace or remedy any reasonable complaint of a former customer of Seller, after Closing Seller shall reimburse Buyer for Buyer's cost of remedying any such complaints provided the complaint is brought to the attention of Seller within ninety (90) days after the Closing Date, Seller shall reimburse Buyer within ten (10) days of Buyer's receipt of an invoice from Buyer reflecting the costs incurred to include, among other things, materials, products and labor.  Any such reimbursement shall not be subject to the Minimum Amount contemplated by Section 8.1 of this Agreement and, as such, such reimbursement shall be from the first dollar.

Notwithstanding the foregoing, the representations and warranties set forth in paragraphs (1) through (25) above do not apply to that portion of the Purchased Assets acquired by Seller from Madison Pre-Hung Doors, Inc.  Seller shall assign to Buyer at Closing Seller's rights regarding the representations and warranties of Seller under the Asset Purchase Agreement to which Seller is a party for the purchase of certain assets of Madison Pre-Hung Doors, Inc.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYER

4.1   Representations and Warranties.  Buyer represents and warrants to Seller as of the date of this Agreement and as of the Closing as follows:

(01)  Organization.  Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of North Dakota and, by the date of Closing, will be in good standing under the laws of the State of Wisconsin, and has all necessary power to own its properties and to carry on its business as now owned and operated.

14

(02)   No Breach or Violation.   The entering into of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in or constitute any of the following: (a) a default or an event that, with notice or lapse of time or both, would be a default, breach, or violation of the articles of incorporation or bylaws of Buyer; or any lease, license, promissory note, contract, commitment, indenture, mortgage, deed of trust, or other agreement, instrument, or arrangement to which Buyer is a party or by which Buyer or the property of Buyer is bound; or (b) an event that would permit any party to terminate any agreement or to accelerate the maturity of any indebtedness or other obligation of Buyer.

(03)   Authority.   Subject to the approval contemplated by Section 6.1(06), Buyer has the right, power, legal capacity, and authority to enter into, and perform the obligations under this Agreement and the related documents to be delivered in connection herewith, and no approvals or consents of any persons or entities are necessary.   The execution and delivery of this Agreement by Buyer and the consummation of the transaction contemplated in this Agreement have been or will be duly authorized by the appropriate parties pursuant to the governing documents of Buyer.

(04)   Broker.   Buyer is not under contract with a broker, agent, consultant or other similar person to pay a fee in exchange for assisting Buyer in procuring, negotiating or closing the transaction hereunder.

## ARTICLE 5
## CONDUCT BEFORE CLOSING

5.1   Access to Information. From the Effective Date through Closing, Seller shall provide and cause to be provided to Buyer, and Buyer's counsel, accountants, and other representatives, reasonable access during mutually agreeable convenient times and at mutually agreeable convenient locations to all properties, books, accounts, records, contracts, documents, and all data and information that may reasonably be requested by Buyer.  Among other things, Seller shall provide Buyer with access to the Purchased Assets, including sales in progress and work in process of Seller and shall allow Buyer and its agents and representatives to inspect and examine the Business Real Estate, Fixed Assets and inventory of Seller at such reasonable times as Buyer may request in advance.  In addition, subject to Section 1.6, no earlier than the second (2nd) Business Day prior to the Closing Date, in connection with the preparation of the schedules of assets as contemplated in Section 1.1, Seller and Buyer shall have jointly completed a physical inventory of Seller's inventory with each Party to bear their own expense in connection with inspection of such inventory.

5.2   Conduct of Business Prior to Closing.

(01)   Conduct of Business.  Prior to the Closing, Seller shall conduct the operation of its Business and affairs in the ordinary course and consistent with its prior practice and shall maintain, keep and preserve its assets and properties (including, without limitation, the Purchased Assets) in good condition and repair and

15

maintain insurance thereon in accordance with its present practices, and Seller will use its reasonable efforts (a) to preserve the business and organization of Seller intact; (b) to preserve for the benefit of Buyer the goodwill of Seller's suppliers, customers, and others having business relations with it; and (c) maintain the Business Real Estate in its existing condition subject to normal wear and tear and repair until Closing. Without limiting the generality of the foregoing, prior to Closing, Seller shall not without Buyer's prior written approval merge or consolidate or obligate itself to do so into any other entity, enter into any contract, agreement, commitment or other understanding or arrangement except for those in the ordinary course of business.

(02)   Notice of Change. Each Party shall give the other Party prompt written notice of any change in any of the information contained in the representations and warranties made in Sections 3.1 and 4.1, or elsewhere in this Agreement, which occur prior to the Closing Date; provided that no such notice shall be deemed to cure any prior breach of a representation or warranty when made and each Party shall retain all of its rights and remedies hereunder in the event of a breach of a representation or warranty when made by the other Party.

(03)   Changes in Status Quo. Between the Effective Date and the Closing Date, without Buyer's prior consent, Seller shall not engage in any material activity or enter into any material transaction with respect to the Business outside the ordinary and usual course of the business. In addition to the foregoing, Seller shall regularly consult with and follow the reasonable recommendations of Buyer with respect to (a) cancellation of contracts, agreements, commitments or other understandings or arrangements to which Seller is a party; (b) purchasing, pricing or selling policies (including, without limitation, selling merchandise at discounts other than in the ordinary course of business); (c) entering into any Seller funded warranties or service contract arrangements; or (d) modifying the wages, salaries or benefits of Seller's employees; provided, however, that nothing contained in this paragraph shall require Seller to take or fail to take any action that, in Seller's reasonable business judgment, is likely to give rise to a substantial penalty or a claim for damages by any third party against Seller, or is likely to result in losses to Seller, or is otherwise likely to prejudice in any respect or interfere with the conduct of Seller's business and operations in the ordinary course consistent with prior practice, or is likely to result in a breach by Seller of any of its representations, warranties or covenants contained in this Agreement (unless any such breach is first waived in writing by Buyer). Notwithstanding the foregoing, Seller shall have the right to acquire, in the ordinary course of business, various assets of Madison Pre-Hung Doors, Inc., on terms determined by Seller in Seller's sole discretion.

5.3   Risk of Loss. The risk of loss of the Purchased Assets shall remain with Seller until the Closing. Buyer shall have the option to either cancel this Agreement without further obligation or to negotiate with Seller a pro rata reduction in the Purchase Price in the event of any material loss, destruction or damage to the Purchased Assets by reason of fire, theft or other

16

casualty prior to the Closing Date.  In the event the Parties cannot agree on the amount of any such pro rata reduction, the Agreement shall be terminated. Risk of loss passes to Buyer upon completion of the Closing.

5.4     Records.  Seller has provided, caused to be provided or will provide to Buyer true, correct, and complete copies of or access to all of Seller's records relating to the operations of the Business and the Business Real Estate, as well as all records concerning Seller's taxes, warranty obligations, sales and customers, as allowed by law, governmental permits and licenses, supplies and purchases, and production as it relates to the Business and the Business Real Estate. Seller shall continue to provide access to Seller's records and operations until the date of Closing.

5.5     Sale Proposal.  Neither Seller nor Members shall enter into any agreements with respect to or enter into any discussions concerning or provide to anyone any information with respect to, or solicit or encourage (including the furnishing of any non-public information concerning Seller) any Sale Proposal.  The term "Sale Proposal" means any proposal with respect to any merger, the consolidation or liquidation of Seller, the sale of a material portion of Seller's assets relating to its Business or the purchase of any equity securities of Seller.

## ARTICLE 6
## CONDITIONS PRECEDENT TO PERFORMANCE

6.1     Conditions Precedent to Buyer's Performance.  All obligations of Buyer under this Agreement are subject, at the option of Buyer, to the fulfillment, at or before the Closing, of each of the following conditions on terms and conditions and in form and content reasonably satisfactory to Buyer at or before the Closing.  Buyer may waive any or all of these conditions in whole or in part without prior notice; provided, however, that no such waiver of a condition shall constitute a waiver by Buyer of any of its other rights or remedies, at law or in equity, if Seller or Members shall be in default of any of their representations, warranties, or covenants under this Agreement.

(01)     Warranties.  All representations and warranties by Seller and Members set forth in this Agreement or in any written document that shall be delivered in connection with this Agreement shall be true and correct in all material respects when made and shall be deemed to have been made again at and as of the Closing and shall then be true and correct in all material respects except for changes in the ordinary course of business as permitted by this Agreement.

(02)     Performance.  Seller and Members shall have performed, satisfied, and complied with all covenants, agreements, and conditions required by this Agreement to be performed or complied with by Seller and Members on or before the Closing.

(03)     No Material Changes.  There shall not have been any material adverse change in the condition (financial or otherwise), business, properties, assets, or prospects of Seller since October 31, 2017, and there shall not have been sustained any

material loss or damage to the Purchased Assets, the Business Real Estate or the Oregon, Wisconsin leased premises.

(04)   <u>Documents</u>.   All documents required to be delivered to Buyer at or prior to Closing shall have been so delivered.

(05)   <u>Absence of Litigation</u>.   No action, suit, or proceeding before any court or any governmental body or authority, pertaining to the transaction contemplated by this Agreement or to its consummation, shall have been instituted or threatened on or before the Closing.

(06)   <u>ESOP Approval</u>.   Buyer shall have received approval from the Trustees of the D & M Industries, Inc. Employee Stock Ownership Plan to enter into and close the transaction contemplated by this Agreement.

(07)   <u>Consents</u>.   Seller shall have obtained the consents of any parties to the consummation of the transactions contemplated by this Agreement, or otherwise pertaining to the matters covered by it, where the consent of any other party may, in the opinion of Buyer's counsel be required.

(08)   <u>Lien Releases</u>.   Seller shall have obtained and delivered to Buyer full and complete releases of all security interests or other encumbrances upon the Purchased Assets, or signed payoffs/estoppels from such lien holders indicating that the security interests shall be terminated upon payments of outstanding amounts due at Closing; and Buyer shall have obtained a judgment, bankruptcy and tax lien search, the results of which indicate that there are no judgments, state, federal, county or other tax liens against Seller and that Seller and/or Members have not filed for bankruptcy protection.

(09)   <u>Licenses and Permits</u>.   Buyer shall have received all necessary licenses, permits and approvals and consents from all applicable federal, state and local authorities in order to conduct the business proposed to be conducted by Buyer.

(10)   <u>Financing</u>.   Buyer shall have received third party financing on conditions satisfactory to Buyer in connection with the transaction contemplated by this Agreement.

(11)   <u>Tax Liability</u>.   Seller shall have delivered to Buyer evidence that all past due and current payroll, sales tax, and use tax liabilities and any other obligations of Seller have been paid and otherwise satisfied with respect to the United States Internal Revenue Service, the Wisconsin Revenue Department, and any other appropriate agency of the State of Wisconsin.

(12)   <u>Environmental Review</u>.   Buyer shall have received a Phase I environmental assessment (and a Phase II environmental assessment if deemed necessary by Buyer) addressed to Buyer, with respect to the Business Real Estate (and the

Oregon, Wisconsin property), by an environmental firm satisfactory to Buyer which reveals the environmental condition of such property satisfactory to Buyer in its sole and absolute discretion.

(13)   <u>Physical Inspection</u>.  Buyer shall have received an inspection report with respect to the Business Real Estate and the Oregon, Wisconsin location which reveals the physical condition of the property satisfactory to Buyer in its sole and absolute discretion, at the expense of Buyer.

(14)   <u>Employee Turnover</u>.  Seller shall have provided evidence to Buyer that there has been no material turnover of Seller's employees from the date of this Agreement to the Closing.

(15)   <u>Real Estate Lease Agreements</u>.  Buyer shall have entered into lease agreements with regard to the Business Real Estate and the Oregon, Wisconsin location on terms and conditions satisfactory to Buyer.

(16)   <u>Inspections</u>.  Buyer shall be satisfied with its due diligence investigations and inspections of the Business, the Business Real Estate, the Oregon, Wisconsin location and the Purchased Assets.

(17)   <u>Lender Approval</u>.  Buyer shall have received the consent of its lender, Bremer Bank, N.A., with regard to the transaction contemplated by this Agreement.

(18)   <u>Madison Pre-Hung Doors, Inc.</u>  Seller shall have completed its acquisition of various assets of Madison Pre-Hung Doors, Inc. on terms acceptable to Buyer.

(19)   <u>Key Employee Bonus Plan</u>.  Buyer shall have developed a bonus plan for key employees which plan shall be acceptable to Scott Copus.

(20)   <u>Equipment Lease</u>.  Buyer and Copus Properties LLC shall have entered into an Equipment Lease Agreement with regard to a Venjakob paint system and related equipment on terms satisfactory to Buyer.

(21)   <u>Assignment</u>.  Buyer, Seller, Madison Pre-Hung Doors, Inc. and the Shareholders of Madison Pre-Hung Doors, Inc. shall have entered into an agreement whereby Seller shall have assigned to Buyer Seller's rights regarding the representations and warranties of Seller under the Asset Purchase Agreement to which Seller is a party for the purchase of certain assets of Madison Pre-Hung Doors, Inc. together with its rights of indemnity thereunder as it relates to such representations and warranties.

6.2   <u>Conditions Precedent to Seller's Performance</u>.  All obligations of Seller under this Agreement are subject at the option of Seller, to the fulfillment, at or before the Closing, of each of the following conditions on terms and conditions and in form and content reasonably satisfactory to Seller at or prior to Closing.  Seller may waive any or all of these conditions in

whole or in part without prior notice; provided, however, that no such waiver of a condition shall constitute a waiver by Seller of any of its other rights or remedies, at law or in equity, if Buyer shall be in default of any of its representations, warranties or covenants under this Agreement.

(01) Warranties.   All representations and warranties by Buyer set forth in this Agreement or in any written document that shall be delivered in connection with this Agreement shall be true and correct in all material respects when made and shall be deemed to have been made again at and as of the Closing and shall then be true and correct in all material respects except for changes in the ordinary course of business as permitted by this Agreement.

(02) Performance of Buyer.   Buyer shall have performed, satisfied, and complied with all covenants, agreements, and conditions required by this Agreement to be performed, complied with, or satisfied by Buyer, on or before the Closing.

(03) Consents.   Buyer shall have obtained the consents of any parties to the consummation of the transactions contemplated by this Agreement, or otherwise, pertaining to the matters covered by it, when the consent of any other party may, in the opinion of Seller's counsel be required.

(04) Business Real Estate Leases.   Buyer shall have entered into lease agreements with regard to the Belleville and Oregon, Wisconsin properties currently occupied by Seller on terms and conditions satisfactory to Scott Copus.

(05) Documents.   All documents required to be delivered to Seller at or prior to Closing shall have been so delivered.

(06) Key Employee Bonus Plan.   Buyer shall have developed a bonus plan for key employees of Buyer which Plan shall be acceptable to Scott Copus.

(07) Madison Pre-Hung Doors, Inc.   Seller shall have completed its acquisition of various assets of Madison Pre-Hung Doors, Inc., on terms acceptable to Seller.

(08) Equipment Lease.   Buyer and Copus Properties LLC shall have entered into an Equipment Lease Agreement with regard to a Venjakob paint system and related equipment on terms satisfactory to Scott Copus.

## ARTICLE 7
## THE CLOSING

7.1   Closing Date.   The closing and consummation of the transactions contemplated by this Agreement (the "Closing") shall occur at 9:00 a.m. on January 2, 2018, or on such other time and date as the Parties shall mutually agree (the "Closing Date"). The Closing shall take place at Murphy Desmond S.C., or at such other place as the Parties shall mutually agree. The transactions contemplated by this Agreement which are to occur at the Closing shall be deemed to have taken place as of 12:01a.m., on January 1, 2018. The Parties shall use due diligence to

effect the Closing on the Closing Date, provided all conditions precedent to the Closing as provided in this Agreement shall have been satisfied.

7.2     <u>Seller's Obligations</u>.   At the Closing, Seller (and Members as applicable) shall deliver or cause to be delivered to Buyer, in form and substance satisfactory to Buyer and Buyer's counsel:

(01)     A bill of sale for the Purchased Assets and instruments in the form of <u>Exhibit "A"</u> attached hereto together with the schedules contemplated by Section 1.1 of this Agreement ("Bill of Sale");

(02)     All other instruments of assignment, conveyance and transfer of property as shall be effective to vest in Buyer good and marketable title to the Purchased Assets;

(03)     All documents required to be delivered to Buyer under the provisions of this Agreement;

(04)     Copies of all contracts, files, and other data and documents pertaining to the Purchased Assets (except Seller's accounting and tax records, minute book and stock ledger, which Seller shall retain for three years after Closing);

(05)     All certificates, consents, schedules, exhibits and attachments in completed form specifying the information required by the provisions of this Agreement;

(06)     Certificates of title for all motor vehicles, if any, transferred by Seller to Buyer as part of the Fixed Assets, duly endorsed, together with lien releases;

(07)     The General Assignment and Assumption Agreement in the form of <u>Exhibit "B"</u> duly executed by Buyer and Seller;

(08)     A certificate dated the date of Closing executed by the President/Manager of Seller and Members certifying that the conditions specified in Sections 6.1(01), (02), (03), and (05) have been fulfilled;

(09)     Resolutions of the members of Seller unanimously authorizing the execution and delivery of this Agreement by Seller and the performance of Seller's covenants and obligations under this Agreement;

(10)     Documentation evidencing that immediately upon Closing, Seller shall have changed its name so that it does not resemble in any way "Capital Finishing" and shall have abandoned and discontinued its use and ownership of the name "Capital Finishing" and the name "Madison Pre-Hung Door" and assigned such names to Buyer together with evidence that Madison Pre-Hung Doors, Inc. shall have changed its name so that it does not resemble in any way "Madison Pre-Hung Doors" and shall have assigned such name to Buyer.

(11)    Seller and Scott Copus shall have executed and delivered to Buyer the Non-Competition, Non-Solicitation and Non-Disparagement Agreement in the form of Exhibit "C" attached hereto;

(12)    A tax clearance letter issued by the Wisconsin Revenue Department with respect to Seller and Madison Pre-Hung Doors, Inc., dated no earlier than five (5) days prior to the Closing Date;

(13)    A Certificate of Good Standing issued by the State of Wisconsin evidencing that Seller is authorized to do business and is in good standing in those states, which certificate shall be dated no earlier than five (5) days in advance of the Closing Date;

(14)    Scott Copus shall have executed and delivered to Buyer the Employment Agreement in the form of Exhibit "D" attached hereto;

(15)    Seller shall have delivered to Buyer a self-prepared financial statement of Buyer, as of the Closing Date, prepared in a manner consistent with the preparation of the Financial Statements including a detailed trade accounts receivable report;

(16)    A Wisconsin Report of Business Transfer form completed and signed by Seller and Buyer.

Seller and Members, at any time after the Closing, shall execute and deliver any further assignments or instruments of transfer reasonably required by Buyer, and will take any other action consistent with the terms of this Agreement that may reasonably be requested by Buyer as necessary or desirable in order to more effectively transfer, convey, and assign to Buyer, and to confirm Buyer's title to all of the Purchased Assets, to put Buyer in actual possession and control thereof and to assist Buyer in executing all rights with respect thereto. Moreover, if requested by Buyer, Seller and Members further agree to prosecute or otherwise enforce in their own name for the benefit of Buyer, any claim, right, or benefit transferred to Buyer by the provisions of this Agreement that may require prosecution or enforcement in Seller or Members' name. Any prosecution or enforcement of claims, rights, or benefits under this provision shall be at Seller or Members' expense, unless the prosecution or enforcement is made necessary by a breach of this Agreement by Buyer. In the event it is necessary for Seller and Members to retain counsel to honor their obligations under this paragraph, such counsel shall be approved in advance by Buyer which approval shall not be unreasonably withheld.

7.3    <u>Buyer's Obligations</u>. At the Closing, Buyer shall deliver, or cause to be delivered to Seller:

(01)    The Purchase Price as provided in Section 2.2 of this Agreement;

(02)    All other certificates or documents required of Buyer by the terms of this Agreement; and

22

(03)    All certificates, consents, schedules, exhibits and attachments in completed form specifying the information required by the provisions of this Agreement.

Buyer shall execute and deliver any further and additional documents and will take such other action consistent with the terms of this Agreement that may reasonably be requested by Seller as Seller may reasonably deem necessary to carry into effect the transaction contemplated by this Agreement.

7.4    <u>Possession.</u>    Simultaneously with the consummation of the Closing, Seller, through its officers, agents, and employees, will place Buyer into full possession and enjoyment of all Purchased Assets. Seller shall remove the Excluded Assets from the Business Real Estate, within five (5) calendar days from the Closing Date at Seller's sole expense and shall do so with minimal disruption to Buyer and to Buyer's operations.

## ARTICLE 8
## OBLIGATIONS AFTER CLOSING

8.1    <u>Indemnity obligations of Seller and Members.</u>

(01)    Subject to the limitations contained in this Agreement, Seller and Members shall, jointly and severally, indemnify, defend and hold harmless Buyer (and its respective directors, officers, shareholders, employees, attorneys and agents) from and against, and in respect of any and all liabilities, losses, diminution in value, damages, claims, actions or causes of action, statutory, common law or otherwise, fines, penalties, taxes, encumbrances, judgments, demands, setoffs, counterclaims, litigation, and other proceedings and costs and expenses (including reasonable attorneys' fees, fees and expenses of consultants, experts and contractors, and all other reasonable expenses incurred in investigating, preparing or defending any notice of violation, litigation or other proceeding, commenced or threatened) (collectively, "Claims"), against or suffered by Buyer (net of any insurance proceeds payable or available to Buyer) arising out of or resulting, directly or indirectly, from or in any way connected with:

    (a)    any actual or alleged untruth, inaccuracy, breach, or nonfulfillment of any representation, warranty, covenant or agreement of Seller or Members contained in this Agreement, in any document executed pursuant to this Agreement, or any document or information delivered or provided to Buyer in connection with the transaction contemplated under this Agreement;

    (b)    the refusal or failure of Seller or Members, in breach of this Agreement, to perform and consummate the delivery of the Purchased Assets and the other transactions contemplated by this Agreement;

    (c)    any Claim for finder's fee or brokerage or other commission arising by reason of any services alleged to have been rendered to or at the instance

of Seller or Members with respect to this Agreement or any of the transactions contemplated hereby;

(d)    any debts, obligations or liabilities of Seller other than the Assumed Liabilities;

(e)    any taxes, whether income, property (real or personal), payroll, sales, excise, use or otherwise (including penalties or interest related thereto) due from Seller;

(f)    any Claim arising out of or incident to any acts, omissions, events or occurrences attributable to Seller prior to the Closing Date;

(g)    any Claim by any present, former or future employee of Seller including, but not limited to, claims for compensation, severance pay, vacation pay, medical benefits, COBRA benefits or overtime attributable to Seller; and

(h)    any and all actions, suits, proceedings, claims, demands, interest, penalties, assessments, judgments, costs and expenses, including, without limitation, reasonable legal fees and expenses incurred in enforcing this indemnity.

Notwithstanding the foregoing, Seller and Members shall have no liability under this Section 8.1 unless, and only to the extent that, Claims thereunder for which Buyer is entitled to indemnification, exceed $5,000 in the aggregate (the "Minimum Amount"), in which case Seller and Members shall be liable only for Claims exceeding in the aggregate the Minimum Amount.

8.2    <u>Indemnity obligations of Buyer.</u>

(01)    Subject to the limitations contained in this Agreement, Buyer agrees to indemnify, defend and hold harmless Seller (and its respective members, managers, officers, officers, employees, shareholders, employees, attorneys and agents) against any and all Claims (as defined in Section 8.1) against or suffered by Seller (net of any insurance proceeds payable or available to Seller) arising out of or resulting, directly or indirectly, from or in any way connected with:

(a)    any actual or alleged untruth, inaccuracy, breach, or nonfulfillment of any representation, warranty, covenant or agreement of Buyer contained in this Agreement or in any document executed pursuant to this Agreement, or any document or information delivered or provided to Seller in connection with the transaction contemplated under this Agreement;

(b)    the refusal or failure of Buyer, in breach of this Agreement, to perform and consummate the transactions contemplated by this Agreement;

(c)     any Claim for finder's fee or brokerage or other commission arising by reason of any services alleged to have been rendered to or at the instance of Buyer with respect to this Agreement or any of the transactions contemplated hereby;

(d)     any Claim arising out of or incident to any acts, omissions, events or occurrences attributable to Buyer after the Closing Date, including Buyer's failure to fulfill any Assumed Liability;

(e)     any taxes, whether income, property (real or personal), payroll, sales, excise, use or otherwise (including penalties or interest related thereto) due from Buyer after the Closing Date and not an obligation of Seller hereunder;

(f)     any Claim related to Buyer's use and ownership of the Purchased Assets arising on or after the Closing Date; and

(g)     any and all actions, suits, proceedings, claims, demands, interest, penalties, assessments, judgments, costs and expenses, including, without limitation, reasonable legal fees and expenses incurred in enforcing this indemnity.

Notwithstanding the foregoing, Buyer shall have no liability under this Section 8.2, unless, and only to the extent that, Claims arising thereunder for which Seller is entitled to indemnification hereunder exceed the Minimum Amount, in which event Buyer shall be liable only for Claims exceeding in the aggregate the Minimum Amount.

8.3     Indemnification Procedure Involving Third Parties.     The indemnification obligations of the parties set forth in Sections 8.1 and 8.2 with respect to matters involving third parties shall be governed by the following provisions:

(01)    Promptly after receipt by any party (the "Indemnitee") of notice of any demand, claim or circumstances from a third party which with the lapse of time would give rise to a Claim, or the commencement (or threatened commencement) of any action, proceeding or investigation that may result in a Claim (an "Asserted Liability"), the Indemnitee shall give notice thereof, together with a true and complete copy of the demand or claim, if any (the "Claims Notice"), to any other party or parties obligated to provide indemnification pursuant to 8.1 or 8.2 (the "Indemnitor").     The Claims Notice shall describe the Asserted Liability in reasonable detail, and shall indicate the amount (estimated, if necessary) of the Claim that has been or may be suffered by the Indemnitee.

(02)    The Indemnitor may elect to compromise or defend at its own expense and by its own counsel, who is approved by Indemnitee, any Asserted Liability; provided that if the amount of the Claim, together with all Claims in any prior Claims Notices which the Indemnitor has received, is less than the Minimum Amount, the Indemnitor may elect either to have the Claim paid or provided for by the

Indemnitee (and considered part of the Claims which are subject to the Minimum Amount) or the Indemnitor may pay, compromise or defend the Asserted Liability, in which event it shall not be counted as part of the Claims included in the Minimum Amount. If the Indemnitor elects to compromise or defend such Asserted Liability, it shall within fifteen (15) days (or sooner, if the nature of the Asserted Liability so requires) notify the Indemnitee of its intent to do so, and the Indemnitee shall cooperate, at the expense of the Indemnitor, in the compromise of, or defense against, such Asserted liability. If the Indemnitor elects not to compromise or defend against the Asserted Liability, fails to notify the Indemnitee of its election as herein provided or contests its obligation to indemnity under this Agreement, the Indemnitee may pay, compromise or defend such Asserted Liability. In any event, the Indemnitee and the Indemnitor may participate, each at its own expense, in the defense of such Asserted Liability, but the Indemnitor shall control the defense and make all of the decisions with respect thereto unless the Indemnitor elects not to compromise or defend against the Asserted Liability, fails to notify Indemnitee of its election or contests its obligation to indemnity. Each party shall make available to the other party any books, records or other documents within its control that are necessary for such defense. Notwithstanding anything in this Section to the contrary, the Indemnitor shall not, without the prior written consent of the Indemnitee (which consent shall not be unreasonably withheld or delayed), consent to any admission or the entry of any judgment with respect to the matter, or enter into any settlement which imposes an injunction or other equitable relief upon the Indemnitee or does not include an unconditional provision whereby the plaintiff or claimant in the matter releases the Indemnitee from all liability with respect to such matter. In addition, notwithstanding the foregoing, the Indemnitor shall provide the Indemnitee with evidence reasonably acceptable to the Indemnitee that the Indemnitor shall have the financial resources to defend against any Asserted Liability and fulfill its indemnification obligations. If the Indemnitor fails to meet the foregoing requirements, the Indemnitee shall have the right to undertake the defense of such Asserted Liability at the expense and for the account of the Indemnitor.

8.4     Limitations on Indemnification.

(01)    The representations and warranties under this Agreement shall survive the Closing for a period of twenty-four (24) months from the Closing Date (the "Survival Period Termination Date"); provided however that the representations and warranties of (a) the Seller and Members under Sections 3.1 (01), (02), (05), (07), (09), (12), (14), (18), and (21) and (b) the Buyer under Sections 4.1 (01), (02), (03), and (04) (the "Fundamental Representations") shall extend beyond the Survival Period Termination Date and survive until the expiration of the applicable statute of limitations. In no event shall any such expiration affect the rights and obligations of the Parties as to any written claims asserted prior to the expiration of the Survival Period Termination Date or applicable statute of limitations, as the case may be.

(02)    The Seller and Members shall have no liability under Sections 8.1 and 8.3 unless, and only to the extent that, Claims thereunder for which the Buyer is entitled to indemnification, exceed the Minimum Amount, in which case the Seller and Members shall be obligated to indemnify the Buyer from the first dollar. Notwithstanding the foregoing, Seller and Member's liability under Sections 8.1 and 8.3 shall not exceed Two Million Dollars ($2,000,000) (the "Cap") except for matters relating to (a) actual fraud, (b) willful misrepresentation, or (c) any breach of the Seller's and Member's Fundamental Representations, which shall not be subject to the Cap.

(03)    The Buyer shall have no liability under Sections 8.2 and 8.3 unless, and only to the extent that, Claims, thereunder for which Seller and Shareholder are entitled to indemnification, exceed the Minimum Amount in which case the Buyer shall be obligated to indemnify the Seller and Shareholder from the first dollar. Notwithstanding the foregoing, the liability of Buyer under Sections 8.2 and 8.3 shall not exceed the Cap except for matters related to (a) actual fraud, or (b) willful misrepresentation, or (c) any breach of the Buyer's Fundamental Representations which shall not be subject to the Cap.

(04)    In no event shall any Party be liable to the other for any damages not reasonably foreseeable or punitive damages of any kind that may be suffered by the other with respect to the subject matter of this Agreement.  Such damages or losses include, but are not limited to, reimbursement or damages on account of present or prospective profits.

(05)    For the avoidance of confusion, the Non-Competition, Non-Solicitation and Non-Disparagement Agreement and the Employment Agreement, both of which are contemplated by this Agreement, shall not be subject to any of the limitations on indemnification as set forth in this Section 8.4 including, without limitation, the Survival Period Termination Date, the Minimum Amount or the CAP.

## ARTICLE 9
## MISCELLANEOUS

9.1     Publicity. Prior to Closing, neither the Members, Seller nor Buyer shall issue any press release (or make any other public announcement) related to this Agreement or the transactions contemplated hereby or make any announcement to the employees, customers or suppliers of the Members or Seller without the prior written approval of the other Parties hereto, except as may be necessary, in the opinion of counsel to the Party seeking to make disclosure, to comply with the requirements of this Agreement or applicable law or as otherwise may be allowed by this Agreement. If any such press release or public announcement is so required, the Party making such disclosure shall consult with the other Parties prior to making such disclosure, and the Parties shall use all reasonable efforts, acting in good faith, to agree upon a text for such disclosure which is satisfactory to all parties. Subsequent to the Closing, Seller and Members agree that without the prior written approval of Buyer, Seller and Members shall not make any public announcement of any kind to any employees, customers or suppliers of Seller, or any press release or public announcement, as to the transactions hereunder except as may be

27

necessary, in the opinion of counsel to the Members and Seller to comply with the requirements of this Agreement or applicable law. Buyer shall be free to make any announcement regarding the transactions contemplated hereby upon Closing, upon prior approval from Seller as to the substance of said announcement, not to be unreasonably withheld.  In no event shall any such announcement include any financial terms of this transaction.  Neither Buyer, Seller nor the Members will make any comment relating to the other party to any other person or entity which is critical, derogatory or which is intended to injure the business or reputation of the other party. Notwithstanding the foregoing, the Members, Seller and Buyer may make appropriate disclosures to key management of Seller and Buyer necessary to complete the due diligence process.

9.2     Expenses.  Each of the Parties shall pay all their respective costs and expenses incurred or to be incurred by it in negotiation and preparation of this Agreement and in closing and carrying out the transactions contemplated by this Agreement.

9.3     Taxes.  Seller will timely pay all sales, use, transfer and documentary taxes payable in connection with the sales, conveyances, assignments, transfers and deliveries to be made to Buyer under this Agreement, including any penalties or interest related thereto.

9.4     Headings.  The subject headings of the Articles, Sections and paragraphs of this Agreement are included for purposes of convenience only, and shall not affect the construction or interpretation of any of its provisions.

9.5     Modifications and Waiver.   This Agreement and the ancillary agreements, certificates, instruments, and documents referred to in this Agreement constitute the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersedes all prior and contemporaneous agreements, letters of intent, representations, and understanding of the Parties.  No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by the Party against whom the supplement, modification or amendment is sought to be enforced against.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver.  No review or investigation of Seller or Members, or their business, or any other matters whatsoever, conducted by Buyer, and no access to Seller's or Members' records made available to Buyer, shall result in any implied waiver of any representation, warranty, covenant, or other obligation of Seller or Members hereunder, or be deemed an acceptance by Buyer of any breach, default, or failure in performance by Seller or Members.  The letter of intent executed by Buyer and Seller prior to this Agreement is, upon execution of this Agreement by the Parties, void and of no further force and effect.

9.6     Counterparts.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.7     Rights of Parties.  Nothing in this Agreement, whether express or implied, is intended to confer any rights, or remedies under or by reason of this Agreement on any persons

or entities other than the Parties and their respective permitted successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any Party to this Agreement, nor shall any provision give any third persons any rights of subrogation or action over against any Party to this Agreement.   There are no third party beneficiaries to this Agreement.

9.8     Assignment.  The Agreement shall be binding on, and shall inure to the benefit of, the Parties and their respective heirs, legal representatives, successors, and assigns except that neither Seller nor the Members shall have any right to assign their rights or obligations under this Agreement to any third party without the prior written consent of Buyer which consent may be withheld by Buyer in its discretion.  No such assignment shall relieve Seller or the Members of their respective obligations hereunder.

9.9     Enforcement Costs.  If any legal action or any arbitration or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it may be entitled.

9.10    Nature and Survival of Representations.   Each statement of representation, warranty, covenant, indemnity, and agreement of the Parties contained in this Agreement, or in any document, or instrument, certificate, opinion, or other writing delivered by or on behalf of any Party, shall survive the Closing in accordance with the terms of this Agreement.

9.11    Notices.  All notices, requests, demands, consents, and other communications required under this Agreement shall be in writing and shall be (01) sent by registered or certified mail, first class postage prepaid, (02) sent by hand or overnight delivery, or (03) sent by Email, in each case addressed to the respective Parties at the addresses set forth below, or to such other address and to the attention of such other persons as a Party hereto may specify from time to time by notice to the other Parties.  Each Notice shall be deemed given and be effective only upon actual receipt (or refusal of receipt).  Copies of any Notices shall be provided as below:

To Seller            Capital Finishing, Inc.
and Members          Attn: Scott Copus


*After Closing*:

957 Timber Ridge Drive
Oregon, WI 53575

*Prior to Closing*:

40 Countryside Drive
Belleville, Wisconsin 53508

*Anytime*:

Email: scopus@charter.net

| | |
|---|---|
| With a copy to: | Attorney Vernon J. Jesse<br>Murphy Desmond S.C.<br>P.O. Box 2038<br>Madison, WI 53701-2038<br>Email:vjesse@murphydesmond.com |
| To Buyer: | Brian Becker<br><br>D & M Industries, Inc.<br>4205 – 30th Avenue South<br>Moorhead, Minnesota 56560 |
| With a copy to: | Michael M. Thomas<br>Conmy Feste Ltd.<br>PO Box 2686<br>Fargo, ND 58108-2686<br>Email: mthomas@conmylaw.com |

Any Party may change its addresses for purposes of this Section by giving the other Party written notice of the new address in the manner set forth above.

9.12    <u>Time of Essence</u>.  Time is of the essence with regard to the performance of this Agreement.

9.13    <u>Governing Law</u>.  This Agreement shall be construed in accordance with, and governed by the laws of the State of Wisconsin without regard to conflicts of law provisions.

9.14    <u>Joint Preparation</u>.  This Agreement shall be deemed to have been jointly prepared by Buyer, Seller and Members and no ambiguity herein shall be construed against any Party based upon the identity of the author of this Agreement or any portion thereof.

9.15    <u>Signatures</u>.  Facsimile and electronic signatures of this Agreement shall be treated as originals.

9.16    <u>Arbitration</u>.

(01)    Buyer, Seller and Members agree, at the request of any Party, to submit to binding arbitration all claims, disputes and controversies between or among them (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise, arising out of or relating to in any way to this Agreement, its negotiation, execution, administration, modification,

30

extension, substitution, formation, inducement, enforcement, default or termination including, but not limited to, any adjustment or reduction of the Purchase Price. Any arbitration proceeding will (i) proceed in Madison, Wisconsin; (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code); and (ii) be conducted in accordance with the Commercial Arbitration Association Rules of the American Arbitration Association ("AAA").

(02)   The arbitration requirement does not limit the right of either party to obtain provisional ancillary remedies such as injunctive relief, before, during or after the pendency of any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of any Party to submit any dispute to arbitration, including those arising from the exercise of the actions detailed in this paragraph.

(03)   Any arbitration proceeding will be before a single arbitrator selected according to the Commercial Arbitration Rules of the AAA. The arbitrator will be a neutral attorney who has practiced in the area of commercial law, including mergers and acquisitions, for a minimum of ten years. The arbitrator will determine whether or not an issue is arbitrable and will give effect to the statutes of limitation in determining any claim. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.

(04)   In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication.

(05)   In any arbitration proceeding discovery will be permitted and will be governed by the Federal Rules of Civil Procedure. All discovery must be completed no later than 20 days before the hearing date and within 180 days of the commencement of arbitration proceedings. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

(06)   The arbitrator shall award costs and expenses of the arbitration proceeding in accordance with the provisions of Section 9.9.

9.17   <u>Termination</u>.   This Agreement may be terminated under the following circumstances:

(01)   By Seller, if any condition to Seller's obligations to close, as provided in Section 6.2, has not been fulfilled as of the Closing Date or clearly cannot be fulfilled by the Closing Date, provided Seller and Members are not in material breach of or material default under this Agreement;

(02)   By Buyer, if any condition to Buyer's obligations to close, as provided in Section 6.1, has not been fulfilled as of the Closing Date or clearly cannot be

31

fulfilled by the Closing Date, provided Buyer is not in material breach of or material default under this Agreement;

(03)    By mutual written consent of Seller, Members and Buyer; or

(04)    Upon written notice given by either party to the other if the Closing has not occurred on or before January 31, 2018, for any reason other than the terminating Party's failure to comply with any of its obligations hereunder.

Any such termination shall be effected by written notice by the Party desiring to terminate to the other Parties to this Agreement.  In such event, and except as provided in Section 9.21, this Agreement shall become void and of no further force and effect, and none of the Parties hereto nor any of their respective directors, officers, managers, members, shareholders, agents or attorneys shall have any liability or further obligation to any other Parties hereto or any of their respective directors, officers, managers, members, shareholders, agents or attorneys pursuant to this Agreement, except as stated in Section 9.20 relating to confidentiality, Section 9.2 relating to expenses and the provisions of this Agreement relating to broker's fees.

9.18    Jurisdiction.  Subject to Section 9.16, the parties consent to jurisdiction as to all issues concerning or relating to this Agreement exclusively with the federal or state district courts designated for Dane County, Wisconsin.  Each of the Parties hereby (a) irrevocably agrees to be bound by any final judgment (after any appeal) of any such court with respect thereto, and (b) irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue of any suit, action or proceedings brought in any such court, and further irrevocably waives to the fullest extent permitted by law any claim that any such suit, action or proceedings brought in any such court has been brought in an inconvenient form.  Each of the Parties agrees that a final judgment (after an appeal) and any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner to the extent provided by law.

9.19    Customer Files.  Seller shall retain all of its customer files and records for six (6) years after Closing and make such files and records readily available to Buyer as Buyer may from time to time request in order to service its customers.

9.20    Confidentiality.   Prior to the Closing Date, and thereafter if the Closing fails to occur, Buyer and its representatives, Seller and its representatives and Members will hold in strict confidence the existence of this Agreement, all data and information obtained regarding one another, in their related businesses, their assets and financial status obtained in connection with this transaction and the terms of this Agreement and any related documents.  Except as may be required by law or any governmental authority, or to obtain any consents or approvals required by this Agreement, or to their respective attorneys, accountants, lenders, insurers, utility providers, consultants, key employees, prospective employees, and prospective assignees of Buyer's rights and obligations hereunder, no Party shall, without the prior written consent of the other Parties, make any disclosure to third parties or persons of the existence of this Agreement, the Parties to this Agreement, the terms of this Agreement, or any other matter related to the transaction contemplated by this Agreement.

32

9.21    Default.  In the event any Party defaults under this Agreement, and such default has not been cured within five (5) business days following receipt by the defaulting Party of written notice of default, the non-defaulting Party shall have all remedies, at law or in equity, available under Wisconsin law including, without limitation, the right to specific performance and the right to sue for damages.  Any such remedy shall be subject to the limitations set forth in this Agreement.

9.22    Unemployment Reserve Account.  To the extent allowed by law, if requested by Buyer, Seller shall transfer its Wisconsin unemployment reserve account and rating to Buyer as of the Closing, with credit to Seller at Closing for the balance in said account at the day of Closing.

9.23    Records Storage: Access to Information and Records after Closing.  After the Closing Date, Buyer agrees to store the records being transferred to Buyer hereunder, at no expense to Seller, until three (3) years from the creation of such records.  Buyer shall be obligated to exercise only the same degree of care in the safeguard and maintenance of said records as Buyer provides its own records.  Should Buyer relocate such records to a location other than the Business Real Estate, Buyer shall provide notice to Seller of such relocation. Where there is a legitimate purpose not injurious to the other Party, or if there is an audit by the Internal Revenue Service, other governmental inquiry, or litigation or prospective litigation to which Seller or Buyer is, or may become a party, making necessary Seller's access to records of or relating to Seller held by Buyer or Buyer's access to records of or relating to Buyer held by Seller, each Party, as the case may be, will allow the other access to such records during reasonable hours for the sole purpose of obtaining information for use as stated above; provided that Seller's access to such records will be limited only to records relating to periods prior to Closing.

9.24    Exhibits and Schedules.  The Exhibits and Schedules referred to in this Agreement are an integral part of this Agreement and are hereby incorporated by reference into this Agreement.

9.25    Definitions.  The term "knowledge" as used in reference to Seller and Members shall mean the actual knowledge, after due and reasonable inquiry, of the Members and the Seller including, but not limited to, due and reasonable inquiry of the officers and Members of Seller.

**[Signatures on next page]**

IN WITNESS WHEREOF, the parties to this Agreement have duly executed it as of the day and year first above written.

CAPITAL FINISHING LLC

By: _____
       Scott Copus
       Its Authorized Member


_____
Scott Copus,

_____
Christopher M. Gaustad

D & M INDUSTRIES, INC.

By: _____
       Brian Becker
       Its Compliance Manager

[Signature page to Asset Purchase Agreement]

34

# **<u>EXHIBIT 2</u>**

## SCOTT COPUS EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into as of January 1, 2018, by and between **D & M INDUSTRIES, INC.,** a North Dakota corporation whose mailing address is 4205 – 30th Avenue South, Moorhead, Minnesota 56560 ("Employer") and **SCOTT COPUS,** an individual, whose mailing address is 40 Countryside Drive, Belleville, Wisconsin 53508 ("Employee").

The parties desire, to enter into an Agreement providing for the employment of Employee by Employer, subject to the terms and conditions of employment as set forth in this Agreement and Employer's employee handbook or manual.

NOW, THEREFORE, in consideration of the promises, covenants, terms and conditions contained in this Agreement, the parties agree as follows:

1. <u>Employment and Term</u>. Employer agrees to employ Employee and Employee accepts employment with Employer beginning January 1, 2018, and continuing until December 31, 2020 ("Termination Date") unless terminated earlier according to the termination provisions in this Agreement. It is anticipated that Employee shall not have a set number or minimum hours of work that he must perform on a weekly or monthly basis. Employee may devote such time as he deems reasonably necessary to complete Employee's duties under this Employment Agreement.

2. <u>Duties and Qualifications</u>. Except as expressly set forth in this Agreement, Employee shall use Employee's skill and knowledge gained through education and employment for the benefit of Employer and Employee's job, interest, loyalty and employment obligation shall be to Employer as long as Employee is employed by Employer. Employer shall have preference over Employee as to all business Employee transacts and Employer has the right to all business produced by Employee. Employee shall provide services on behalf of Employer, in accordance with the laws of the State of Wisconsin, and in compliance with all policies and procedures as required by Employer. During the term of employment, Employee will provide services as an employee of Employer (including, but not limited to, the services in the job description attached on <u>Exhibit "A"</u> and such services will include performing such other duties as are reasonably assigned to Employee from time to time by Employer. Employee represents that he currently has, or will obtain and maintain, any and all licenses or permits necessary to perform the services and meet the responsibilities expected of him and assigned from time to time by Employer.

3. <u>Status of Employee</u>. The parties expressly acknowledge that Employee, in the performance of services hereunder, is an employee of Employer. Accordingly, Employer shall deduct from all compensation paid to Employee pursuant to this Agreement any sums required by law or any other requirement of any governmental body. Employer shall be entitled to all revenues generated by Employee from the performance of services.

1

4.     <u>Salary and Benefits</u>.  During the term of employment, Employee shall be compensated and receive benefits as set forth in <u>Exhibit "A"</u>.

5.     <u>Confidential Information</u>.

   a.     Employee acknowledges and understands that the Employer has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources, creating customer base, generating customer and potential customer lists, training its employees, and improving its offerings in the field of painting and staining of doors, trim and other millwork, the manufacture and/or sale of constructions goods and supplies and/or the "one step" or "two step" distribution construction goods and supplies. The Employee understands and acknowledges that, as a result of these efforts, the Employer has created, and continues to use and create, Confidential Information (as defined in Section 5(b), below). This Confidential Information provides the Employer with a competitive advantage over others in the marketplace. Employee acknowledges and understands that, as a key executive of the Employer, he will have access to Confidential Information of the Employer. Employee further acknowledges and understands that the unauthorized disclosure of any Confidential Information contrary to this Section 5 would cause permanent, incalculable, and irreparable injury and damage to the Employer.

   b.     For purposes of this Section 5, "Confidential Information" includes, but is not limited to, all information, ideas, knowledge, and discoveries in spoken, printed, electronic, or any other form or medium, whether or not marked as "confidential," that, while not rising to the level of a "trade secret," as that term is defined by Wis. Stat. § 134.90(1)(c) or 18 U.S.C. § 1839(3), is nonetheless confidential and proprietary to the Employer and which is not generally known to the public, relating directly or indirectly to: methods of doing business, operations, valuation methods, accounting and legal information, business ideas, equipment, technology, patents, know-how, inventions, improvements, designs, business plans, marketing plans, cost and pricing policies or information, the prices charged by the Employer to its customers, the volume of orders of such customers, internal memoranda, development programs, sales methods, supplier lists, mailing lists, customers, customer requirements, computer programs, and other confidential or proprietary technical or business information and data whether or not such information or data is patentable, trademarkable, or copyrightable. Confidential Information also includes any information of any other person or entity that has entrusted such information to the Employer in confidence.

   The Employee understands that the above list is not exhaustive and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used. The Employee further

2

understands and agrees that Confidential Information includes information developed by him in the course of Employee's employment by the Employer as if the Employer furnished the same Confidential Information to the Employee in the first instance. Confidential Information does not, however, include any information that now or hereafter is in the public domain by means other than disclosure by Employee in violation of this Section 5.

c.    Employee agrees and covenants, in the State of Wisconsin , (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly, disclose, publish, communicate, or make available Confidential Information or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person (including other employees of the Employer) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Employer and, in any event, not to anyone outside of the direct employ of the Employer except as required in the performance of the Employee's authorized employment duties to the Employer or with the prior consent of the Manager in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information and not to copy any documents, records, files, media, or other resources containing any Confidential Information or remove any such documents, records, files, media, or other resources from the premises or control of the Employer, except as required in the performance of the Employee's authorized employment duties to the Employer or with the prior consent of the Manager in each instance.

d.    Employee acknowledges that Employee's obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Employee first having access to Confidential Information, regardless of when that access occurred in relation to the execution of this Agreement, and shall continue during and after Employee's employment by the Employer until the earlier of (i) two years after the termination of Employee's employment with the Employer or (ii) such time as such Confidential Information has become public knowledge, other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf. Nothing in this provision shall be interpreted so as to prohibit or restrict Employee from being employed by another individual, entity, company, or corporation. Further, nothing in this Agreement shall prevent Employee, after termination of Employee's employment with the Employer, from using Employee's general skills and knowledge gained while serving as an employee of the Employer.

e.    Notwithstanding the provisions of Section 5(c), Employee may disclose Confidential Information at such times, in such manner, and to the extent disclosure is required by applicable law, provided that Employee (i) provides Employer with prior written notice of such disclosure so as to permit Employer to seek a protective order or other appropriate remedy, (ii) limits such disclosure to

3

what is strictly required, and (iii) attempts to preserve the confidentiality of any such Confidential Information so disclosed.

f.      Pursuant to the Economic Espionage Act, 18 U.S.C. § 1831, et seq., as amended by the Defend Trade Secrets Act of 2016, and specifically pursuant to 18 U.S.C. § 1833(b), Employee shall take notice that an individual will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, provided that it is disclosed solely for the purpose of reporting or investigating a suspected violation of law or is made in a complaint or other document filed in a lawsuit or other proceeding provided that the complaint or other document is filed under seal so that it is not disclosed to the public.

g.      Employee acknowledges and agrees that, in the event of a breach by him of this Section 5, the Employer is entitled to equitable relief against Employee, including temporary restraining orders and preliminary and permanent injunctions to restrain Employee from any such breach and to compel compliance with the obligations of Employee as set forth in this Section 5. Employee waives the posting of a bond or undertaking as a condition to such relief.

h.      Nothing in this Section 5 reduces Employee's obligation to comply with applicable laws relating to trade secrets, confidential information, and unfair competition. Without limitation, the provisions of Section 5(c), including the time duration and geographic scope specified in Section 5(d), shall not affect Employee's obligations to comply with applicable laws with respect to Confidential Information that constitutes a trade secret.

6.   Non-Solicitation.

a.      Employee hereby agrees that for a period of two years after termination of Employee's employment for any reason, he will not directly or indirectly interfere with, contact, solicit, or endeavor to entice a "Customer of Employer" (as defined in Section 6(b) below) for the purpose of causing any such Customer of Employer not to do business with the Employer, to reduce its volume of business with the Employer, or to purchase from any source other than the Employer products or services of the kind sold by the Employer. Employee shall not approach any Customer of Employer for any such purpose or knowingly cooperate with the taking of any such action by any other person, firm, corporation, or entity of any kind.

b.      For purposes of this Section 6, the term "Customer of Employer" means any person or entity that (i) purchased products or related services from the Employer during the one year period prior to last day of Employee's employment with the Employer and (ii) for which Employee (A) performed services or otherwise dealt with on behalf of Employer or (B) obtained special knowledge as a result of

4

Employee's position with Employer. The term "Customer of the Employer" does not include any customer who has notified the Employer prior to the termination of Employee's employment that it is ceasing to do business with the Employer or materially reducing its volume of business with the Employer through no misconduct by Employee or a breach of any provision of this Agreement by Employee. Employee acknowledges and agrees that this definition of "Customer of the Employer" is reasonable given the nature of the Employer's products and services.

c.  Employee agrees that this Section 6, including the provisions relating to duration and scope, is reasonable and necessary to protect and preserve the Employer's legitimate business interests, goodwill, and property rights and to prevent an unfair advantage from being conferred on him. Employee acknowledges that the restrictions imposed will not prevent him from earning a living in the event of, and after, the termination of Employee's employment with the Employer, for whatever reason.

d.  Employee acknowledges that Employee's obligations set forth in this Section 6 will survive beyond the last day of Employee's employment with the Employer and shall continue thereafter for the periods stated herein.

e.  Employee acknowledges that any breach of this Section 6 would result in serious and irreparable injury to the Employer, the Employer could not be adequately compensated by monetary damages alone, and the Employer's remedy at law would not be adequate. Therefore, Employee acknowledges and agrees that, in the event of a breach by him of this Section 6, the Employer is entitled, in addition to any other remedy at law or in equity to which the Employer may be entitled, to equitable relief against him, including temporary restraining orders and preliminary and permanent injunctions to restrain Employee from any breach and to compel compliance with Employee's obligations. Employee waives the posting of a bond or undertaking as a condition to such relief.

7.  Non-Compete.

a.  The Employee understands and acknowledges that the nature of the Employee's position as a key executive of the Employer gives him access to and knowledge of Confidential Information and places him in a position of trust and confidence with the Employer. The Employee understands and acknowledges that Employer's ability to reserve its Confidential Information for the exclusive knowledge and use of the Employer is of great competitive importance and commercial value to the Employer and that improper use or disclosure by the Employee is likely to result in unfair or unlawful competitive activity. The Employee understands and acknowledges that the services he provides to the Employer are unique, special, and extraordinary. The Employee further understands and acknowledges that the Employer is engaged in the painting and staining of doors, trim and other millwork, the manufacture and/or sale of constructions goods and supplies and/or

5

the "one step" or "two step" distribution construction goods and supplies with key customers across the State of Wisconsin.

b.     Because of the Employer's legitimate business interests as described in Section 7(a) above, and the good and valuable consideration offered to the Employee under this Agreement, Employee hereby agrees and covenants not to engage in Prohibited Activity within the State of Wisconsin for a period of two years after termination of Employee's employment for any reason, whether voluntary or involuntary.

c.     "Prohibited Activity" under this Section 7 means any activity in which the Employee acts in the same or similar capacity as he did on behalf of the Employer in the past twelve (12) months, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity on behalf of an entity engaged in the same or similar business as the Employer, including those engaged in the business of painting and staining of doors, trim and other millwork, the manufacture and/or sale of constructions goods and supplies and/or the "one step" or "two step" distribution construction goods and supplies. Prohibited Activity also includes activity that may require or inevitably require disclosure of trade secrets or Confidential Information.

d.     Nothing herein prohibits the Employee from purchasing or owning less than 5% of the publically traded securities of any corporation, provided that Employee's ownership represents a passive investment and Employee is not a controlling person of, or a member of group that controls, such corporation. Furthermore, this Section 7 does not, in any way, restrict or impede the Employee from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or any authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Employee shall promptly provide written notice of any such order to the Manager.

e.     Employee agrees that this Section 7, including the provisions relating to duration, geography, and scope, is reasonable and necessary to protect and preserve the Employer's legitimate business interests, goodwill, and property rights and to prevent an unfair advantage from being conferred on him. Employee acknowledges that the restrictions imposed will not prevent him from earning a living in the event of, and after, the termination of Employee's employment with the Employer, for whatever reason.

f.     Employee acknowledges that Employee's obligations set forth in this Section 7 will survive beyond the last day of Employee's employment with the Employer and shall continue thereafter for the periods stated herein.

g.  Employee acknowledges that any breach of this Section 7 would result in serious and irreparable injury to the Employer, the Employer could not be adequately compensated by monetary damages alone, and the Employer's remedy at law would not be adequate. Therefore, Employee acknowledges and agrees that, in the event of a breach by him of this Section 7, the Employer is entitled, in addition to any other remedy at law or in equity to which the Employer may be entitled, to equitable relief against him, including temporary restraining orders and preliminary and permanent injunctions to restrain Employee from any such breach and to compel compliance with the obligations of Employee. Employee waives the posting of a bond or undertaking as a condition to such relief.

8.  Employer's Property.  For the purposes of this Agreement, Confidential Information shall remain the sole property of the Employer and Employer shall retain all ownership rights in the Confidential Information.  The preceding is only a partial list. Employer has taken extensive efforts to protect this information.  At a minimum, Employee is expected to take the following precautions to protect Confidential Information:

a.  Never store Confidential Information on non-Employer devices or non-Employer cloud-based storage, including personal devices;

b.  Only store or back-up Confidential Information on Employer devices;

c.  Limit access to Confidential Information to those who need to know by logging out of devises and password protecting devices or locking-up information that is not stored on devices;

d.  Sign and abide by any agreements regarding Confidential Information that may be required by affiliated companies of Employer or customers or vendors of Employer.

Employee agrees Employee has no ownership rights to computers and other electronic devices, including but not limited to telephones and voice mail, and that these devices are to be used for business purposes, not personal.  Employee has no ownership rights to the telephone numbers used in connection with Employer's business.  By using the Employer's electronic communications systems, Employee voluntarily consents to monitoring.  The Employer reserves the right to review any files, messages or communications sent, received or stored on the Employer's computer systems or other devices.

Employee is also required to return all Confidential Information and other Employer property and information (whether electronic or otherwise) upon termination of this Agreement.  Both during and after employment, Employee shall not make personal use of or disclose, without authorization from the Employer any Confidential Information or other Employer property (whether electronic or otherwise), either directly or indirectly. Examples of property to be returned includes, but is not limited to, telephone numbers used in connection with Employee's business, electronic or hard copies of documents or

7

other information, reports, phones, computers, IPads and other devises, keys, removable drives, passwords, credit cards and vehicles. Examples of unauthorized personal use of Employer property include:

a.   Storing business information off Employer premises, including storing of electronic information on personal devises or cloud based storage not belonging to Employer;

b.   Removing any documents, electronic or otherwise, from Employer property through means of removable storage, photocopies, flash drives, cloud based storage or other storage devises not belonging to Employer.

Breach of this provision will cause irreparable damage to the Employer which is impossible to measure.  In the event of a breach of this provision, Employee agrees that Employer is immediately entitled to an order granting injunctive relief from any court of competent jurisdiction without the necessity of posting bond and waives any defenses to a request for an order.

This provision should be read as supplementing any subsequent agreement entered into between the parties that may address similar issues to the extent that the provisions do not contradict the terms of any subsequent agreement.

9.   <u>Termination</u>.  Notwithstanding any other provisions of this Agreement, the Agreement shall terminate upon:

a.   The death of Employee;

b.   The existence of "Cause".  For purposes of this Agreement, the term "Cause" shall be defined as:

(1)   Employee's material breach of this Agreement or policy or procedure of Employer;

(2)   Employee's engaging in any act that constitutes a material conflict of interest with the Employer, including any dishonesty by Employee in dealings with Employer, or the commission of fraud by Employee;

(3)   The conviction (or plea of guilty or nolo contendere) of Employee of any felony or other crime involving dishonesty or moral turpitude or any other crime with respect to which imprisonment for more than one year is an available remedy;

(4)   Violation of any confidentiality or non-disclosure provision;

(5)   Willful failure (as determined by Employer) by Employee to comply with a reasonable written request of Employer;

(6)    Employee performing any act or omitting to perform any act for which Employer believes a prudent company, acting in good faith, would terminate the employment of an employee;

(7)    Employee materially failing to comply with any federal, state, or local law, rule, or regulation which applies to or otherwise affects Employee's services or his performance as determined by Employer;

(8)    The use of drugs or alcohol by Employee which has a material adverse impact on Employer;

(9)    In the event Employee is in default of any other agreement with Employer including, but not limited to, that certain Asset Purchase Agreement between Employer, Employee, Capital Finishing LLC and Christopher M. Gaustad dated December 28, 2017, and the Non-Competition, Non-Solicitation and Non-Disparagement Agreement between Employer, Employee and Capital Finishing LLC of approximate even date hereof, as either such agreements may be amended, modified or replaced from time to time;

(10)    The appropriation of a material business opportunity of the Employer (including attempting to secure or securing any personal profit in connection with any transaction entered into on behalf of the Employer);

(11)    The misappropriation of any of the Employer's funds or property; or

(12)    Employee is unable to perform substantially all regular duties and it is determined or reasonably expected that Employee will be unable to perform substantially all regular duties for at least 30 days unless prohibited by law.

c.    The mutual written agreement of Employer and Employee.

10.    <u>Effects of Termination</u>. In the event of termination of this Agreement, neither party shall have any further obligations hereunder except for (i) obligations accruing prior to the date of termination; (ii) obligations, promises or covenants contained herein which are expressly made to extend beyond the term of this Agreement, including, without limitation, confidentiality of information, non-disclosure, and trade secret provisions or agreements; and (iii) any obligations for employee benefits that are covered under COBRA. The termination of this Agreement, for whatever reason, shall not extinguish the right of either party to bring an action, either in law or in equity, for breach of this Agreement by the other party.

11.    <u>Required Disclosure</u>. Employee shall notify Employer immediately and in writing after any of the following events occur or Employee learns of any such occurrence:

9

a.    Any action or proceeding alleging unethical, fraudulent or dishonest behavior or that involves a felony or other crime involving dishonesty or moral turpitude or any other crime to which imprisonment for more than one year is an available remedy against Employee or if such action is seriously threatened by letter or by notice of claim or filed against Employee in any federal or state court of law; or

b.    An event occurs that substantially interrupts Employee's ability to serve as Employee.

12.    <u>Assignability</u>.  This Agreement and the rights and duties created shall not be assignable by Employee.

13.    <u>Notices</u>.  Any notice required or desired to be given under the terms and provisions of this Agreement shall be deemed given if in writing and sent by first-class mail or overnight courier such as Federal Express, to Employee's residence if the notice is to Employee or to the Employer's offices located in Moorhead, Minnesota, if the notice is to the Employer. Notice shall be deemed given as of the date of mailing.

14.    <u>Severability</u>.  Each section, subsection and lesser section of this Agreement constitutes a separate and distinct undertaking, covenant or provision.  In the event that any provision of this Agreement is determined to be invalid or unenforceable, that provision shall be deemed limited by construction in scope and effect to the minimum extent necessary to render the same valid and enforceable, and, in the event such a limiting construction is impossible, such invalid or unenforceable provision shall be deemed severed from this Agreement, but every other provision of this Agreement shall remain in full force and effect.

15.    <u>Headings</u>.  Headings in this Agreement are for convenience only and shall not be used to interpret or construe any of its provisions.

16.    <u>Waiver of Breach</u>.  The failure of a party to enforce any term, provision or condition of this Agreement at any time or times shall not be deemed a waiver of that term, provision or condition for the future, nor shall any specific waiver of a term, provision or condition at one time be deemed a waiver of such term, provision or condition for any future time or times.

17.    <u>Governing Law</u>.  The validity, interpretation and performance of this Agreement shall be governed by the laws of the State of Wisconsin, without giving effect to the principles of comity or conflicts of laws thereof.

18.    <u>Attorneys' Fees</u>.  In the event a dispute related to a breach of this Agreement results in a legal action initiated by Employer to enforce its rights hereunder and if Employer is the prevailing party in such an action, Employer is entitled to recover its reasonable attorneys' fees, court costs and all expenses, incurred in that action, in addition to any other relief to which Employer may be entitled.

19.   <u>Situs</u>.  Employer and Employee agree that any litigation concerning this Agreement shall be venued in the federal or state district court sitting in Dane County, Wisconsin and hereby consents to the personal jurisdiction of such courts hereby waive the claim or defense therein that such courts constitute an inconvenient forum.

20.   <u>Entire Agreement: Counterparts</u>.   This Agreement constitutes the entire agreement between the parties, and supersedes all prior agreements, memoranda, correspondence, conversations and negotiations.  This Agreement may be executed in several counterparts that together shall constitute but one and the same Agreement.

21.   <u>Amendments</u>.   This Agreement may be amended at any time by a written agreement signed by both parties.

**[Signatures on next page]**

11

The parties have executed this Agreement as of the date first written above.

D & M INDUSTRIES, INC.

By: _____
      Brian Becker
      Its Compliance Manager

_____
Scott Copus

[Signature page to Scott Copus Employment Agreement]

The parties have executed this Agreement as of the date first written above.

D & M INDUSTRIES, INC.

By: _____
Brian Becker
Its Compliance Manager


_____
Scott Copus

[Signature page to Scott Copus Employment Agreement]

12

## EXHIBIT "A"

A.  Base Salary.  Employer shall pay Employee a base salary in accordance with the normal pay and procedures of Employer and subject to such withholdings and other normal employee deductions that may be required by law, at an annual rate of $150,000.

B.  Vacation.  So long as Employee is employed by Employer, Employee shall be entitled to not less than four (4) weeks paid vacation which may be taken in accordance with Employer's regular vacation policies.

C.  Benefits.  So long as Employee is employed by Employer, Employer shall provide Employee with health and life insurance and participation in any Employer sponsored 401(k), profit sharing, employee stock ownership plan and other benefits on the same terms and conditions as are made available to other similarly situated employees of the Employer, to the extent such benefits exist from time to time.

D.  Expenses.  So long as Employee is employed by Employer, Employer will reimburse Employee for reasonable business related expenses incurred by him in connection with the performance of his duties, including reimbursement for reasonable expenses for business purposes as determined by Employer.

E.  Vehicle.  So long as Employee is employed by Employer, Employee shall be provided with an Employer vehicle which may be used for Employer purposes. The vehicle initially provided to Employee shall be the Ford F150 included in the Purchased Assets.

F.  Remote Access.  Employee shall be entitled to perform some of his duties remotely, as mutually agreed upon by Employer and Employee from time to time.

G.  Duties.  Employee's duties shall include planning, directing and overseeing the operations of the painting and staining operations of the Employer, carrying out the mission, vision and goals of the Employer and such other responsibilities as reasonably determined by the Employer from time to time.

H.  Bonus Pool.  Employer has implemented a bonus plan for key employees of Employer which bonus pool shall be in existence for a period of three (3) years following the Closing of the transaction contemplated by the Asset Purchase Agreement referred to in paragraph 9 (b) of this Agreement, equal to the following thresholds:

    (i)  25% of Net Income between $1,522,000 and $2,522,000, for the period April 1, 2018, through March 31, 2019.

13

(ii)     25 % of Net Income between $1,604,000 and $2,604,000, for the period April 1, 2019, through March 31, 2020.

(iii)    25% of Net Income between $1,759,000 and $2,759,000, for the period April 1, 2020, through March 31, 2021.

The annual bonus pool would be payable by July 31st of the applicable year.  It is anticipated that Employee, so long as he is employed by the Company, would reasonably determine the allocation of such bonuses, including to himself, subject to the approval of the Board of Directors of the Company, or such officer of the Company designated by the Board of Directors, which approval shall not be unreasonably withheld.   In the event Employee is no longer an employee of the Company, the Company may, in its sole discretion, elect to terminate the bonus pool contemplated by this paragraph.  For purposes of this paragraph, the term Net Income shall be the net income of the Company generated in the operation of the Company's door, trim and millwork painting and staining operations formerly associated with Capital Finishing LLC and Madison Pre-Hung Doors, Inc. including any related party sales to the Company or any of its affiliates.  The term Net Income shall not include any employee stock ownership plan expenses of the Company.  The calculation of Net Income may include certain expenses of the Company deemed beneficial to the entire Company which expenses would be assessed at a reasonable hourly rate to include, by way of example only, accounting and bookkeeping services.   All calculations contemplated by this paragraph shall be made by the Company in its reasonable and good faith discretion and shall be deemed binding upon the parties absent manifest error.

# EXHIBIT 3



EXHIBIT

**A**

_____

THIS DOCUMENT IS PROTECTED BY A VOID PANTOGRAPH, A MICROPRINT SIGNATURE LINE AND A HEAT SENSITIVE PADLOCK ICON. SECURITY FEATURES ARE LISTED ON THE BACK.

24645

**MID-AMERICA PROTECTIVE COATINGS, INC**
85 W. INDUSTRIAL ROAD
ADDISON, IL 60101

WINTRUST COMMERCIAL BANKING
ARLINGTON HEIGHTS, IL 60004

25-460/0719

NUMBER

**VOID AFTER 180 DAYS**

| DATE | AMOUNT |
|---|---|
| 09/07/21 | *****6274.10** |

PAY:

SIX THOUSAND TWO HUNDRED SEVENTY-FOUR DOLLARS AND 10 CENTS

TO THE
ORDER
OF

CAPITAL FINSHING
40 COUNTRYSIDE DR
BELLEVILLE, WI  53508

_____ MP

_____ MP
AUTHORIZED SIGNATURE

24645

MID-AMERICA PROTECTIVE COATINGS, INC.   85 W. INDUSTRIAL RD.  ADDISON, IL 60101

| Ref Date | Reference | Description | Gross Amount | Discount | Balance |
|---|---|---|---|---|---|
| 09/01/21 | MAP1873 | | 6274.10 | 0.00 | 6274.10 |

Check No: 24645   Check Date: 09/07/21   Vendor: 030339 CAPITAL FINSHING          Total:   6,274.10

# **<u>EXHIBIT 4</u>**

September 01, 2021

## SALES DETAIL REPORT
FROM 08/01/21 THRU 08/31/21

Page 1 of 1

Customer:  CAPITAL FINISHING LLC

40 COUNTRYSIDE DRIVE

BELLEVILLE WI

| Date | Invoice | Ty | Item Number | Descripion | Price | Quantity | UM | Amount |
|------|---------|----|-------------|------------|-------|----------|----|--------|
| 08/12/21 | 83256 | FG | M-709 | WHITE BASE | 25.55 | 624.000 | GL | 15,943.20 |
| 08/13/21 | 83261 | FG | M-709 | WHITE BASE | 25.55 | 165.000 | GL | 4,215.75 |
| 08/24/21 | 83279 | FG | SH-252 | SW7757 HI.REFLECT.WHITE | 25.55 | 208.000 | GL | 5,314.40 |
| 08/24/21 | 83280 | FG | SB-259 | WHITE WB PRIMER WBP1102 | 19.65 | 416.000 | GL | 8,174.40 |
| 08/31/21 | 83297 | FG | M-709 | WHITE BASE | 25.55 | 468.000 | GL | 11,957.40 |
| 08/31/21 | 83301 | FG | SI-213 | SCHWIETERS SNOWBOUND | 25.55 | 104.000 | GL | 2,657.20 |
| | | | | *** TOTAL | | | | 48,262.35 |